**Randy BRITTON, Plaintiff,**

**v.**

**Patrick MALONEY, Defendant.**

**Civil Action No. 93–11430–NG.**

United States District Court,
D. Massachusetts.

Sept. 26, 1997.

Randy Britton, Lexington, MA, pro se.

Carolyn P. Britton, Lexington, MA, pro se.

Robert Boyle, City of Boston Law Dept-
ment, Mary Jo Harris, Kopelman & Paige,
P.C., Andrea W. McCarthy, Boston, MA,
Robert J. Boyle, Jr., Asst. Corp. Counsel, for
defendants.

Victor H. Polk, Jr., Bingham, Dana &
Gould, Boston, MA, other interested party.

### MEMORANDUM AND ORDER

GERTNER, District Judge:

TABLE OF CONTENTS
MEMORANDUM AND ORDER
September 26, 1997

I. INTRODUCTION ....................................................29

II. FACTS ADDUCED AT TRIAL ...........................................30
 A. Britton's Version ..........................................30

B. The Officers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31
 1. Dooley's Version . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32
 2. Maloney's Version . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32
C. Stampley's Version . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .33
D. Loughin's Presence at Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .33
E. The Jury Verdict . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .33

III. DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .33
 A. Failure to State a Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .34
 1. The Aibright Plurality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .35
 2. Claims Left Open by Albright . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .35
 a. Justice Ginsburg . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .36
 b. Justice Souter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .36
 c. Justice Stevens . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .36
 3. Decisions After Albright . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .36
 4. Britton's § 1983 Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .37
 a. "Continuing Seizure" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .37
 b. An "Exceptional" Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .38
 c. Retaliation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .38
 B. Sufficiency of the Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .40
 1. § 1983 Claim and Malicious Prosecution . . . . . . . . . . . . . . . . . . . . . . .41
 a. Retaliatory Motive . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .41
 b. Termination in the Plaintiff's Favor . . . . . . . . . . . . . . . . . . . . . .43
 2. Abuse of Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .44
 3. State Civil Rights Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .44
 C. Errors in the Jury Instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .44
 1. Procedures Followed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .45
 a. Charge Conference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .45
 i) The Court's Usual Procedure . . . . . . . . . . . . . . . . . . . . . . . . .45
 ii) The Britton Procedure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .46
 b. Submission of Written Instructions . . . . . . . . . . . . . . . . . . . . . . .47
 c. Submission of an Amended Verdict Slip . . . . . . . . . . . . . . . . . . .48
 2. Substantive Challenges to the Instructions . . . . . . . . . . . . . . . . . . . .48
 a. Malice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .48
 b. The Legality of Britton's Rifle, and his Carrying a Rifle . . . . . . . . . . . . .50
 3. Britton's Federal Civil Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .50
 a. General Description of 1983 Cause of Action . . . . . . . . . . . . . . . .50
 b. Probable Cause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .51
 c. Inquiry into the Subjective Minds of the Officers . . . . . . . . . . . . .52
 d. Causation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .53
 e. Definition of Improper Motive . . . . . . . . . . . . . . . . . . . . . . . . . . .54
 4. Other State law Claims: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .54
 a. State Civil Rights Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .54
 b. Abuse of Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .54
 D. Remittitur . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .55
 E. Damages Under the § 1983 Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .56

## I. *INTRODUCTION*

Before me are defendant Patrick J. Maloney's motion for a judgment as a matter of law (docket entry # 183), motion for a new trial (docket entry # 184), and motion for remittitur (docket entry # 184).

Plaintiff Randy Britton ("Britton") was then and is now *pro se*. Britton is an African–American man, who is a graduate of both West Point and the Harvard University Graduate School of Business. His goal was to work as a stockbroker in New York City. He alleged that several Boston police officers illegally seized a rifle he owned and then pressed false felony charges against him when he threatened to sue for its return. The felony charges, he claimed, had a substantial effect on his life, his well-being and his prospects. The officers denied these allegations.[1]

1. The officers are Vincent K. Donohoe, Patrick J. Maloney, Thomas Dooley and James Wood.

This case was tried before a jury from February 3, 1997, through February 12, 1997. The jury returned a verdict for the plaintiff on four of five counts against defendant Patrick J. Maloney ("Maloney") and awarded damages of $200,000.

Since the plaintiff was *pro sé* and the issues complex, I invited the parties to use their post-verdict motions to raise any concerns about the outcome which they believed were significant. Maloney urges this Court to reverse the jury's verdict and enter judgment as a matter of law in his favor, or, in the alternative, order a new trial.

After review of the papers and the record, defendant's motions are **DENIED**.

## II. *FACTS ADDUCED AT TRIAL*

On June 30, 1990, around 5:20–5:30 p.m., plaintiff Randy Britton entered the Boston Police Department ("BPD") headquarters at 154 Berkeley Street in Boston, carrying the unattached barrel and action portions of an AR–7 rifle. Essentially, Britton claims that the police took his rifle, illegally retained it and then brought false charges against him in retaliation for his threat to sue for its return.

### A. *Britton's Version*

Prior to arriving at the police station, Britton and his daughter had been on their way to the Regional Census Headquarters for the United States Census Bureau, where he was employed.[2] Britton testified that while en route, he was chased by two individuals in a red car; the passengers—he claimed—pointed a gun at him. Fearing for his own safety and that of his daughter, Britton drove to the BPD Headquarters. He got out of his car and carried his daughter and the barrel and action portions of his rifle into the building.[3] An unarmed patrol officer, Sandra Springer Glenn ("Springer"), was seated at a desk in the BPD lobby when Britton entered.[4]

Britton testified that he told Springer that he was being chased and needed help. About five minutes passed, and Britton became afraid that the people who had been chasing him would come into the police station. He left the lobby and stood in the building entrance. He saw a red car traveling around the block—the the same car that had chased him earlier. At this point, someone—defendant Detective Thomas Dooley ("Dooley")—came up and grabbed Britton from behind; Dooley was not in uniform. Dooley grabbed the barrel of Britton's rifle and began to pull.

As Britton let go of the rifle, he saw the red car circle around the block again; he told Dooley, "There they are. Those are the people who are trying to kill me." Britton said Dooley took the rifle and walked outside, towards the red car. A woman got out of the car,[5] and Britton observed Dooley speak with her. Sergeant Maloney then appeared.[6] Britton was escorted by Maloney and other unidentified officers to the second floor of BPD headquarters. At this point, Britton no longer had the rifle; it was in the hands of either Maloney or Dooley.

Britton, his daughter, and the officers went upstairs, where they remained for about thir-

---

Wood's and Donohoe's motion for findings as a matter of law was granted. The jury only returned a verdict against Maloney. ·

2. Britton testified that his Census job required him to spend some time in the Roxbury housing projects. He felt he needed protection, so he decided to carry his unloaded rifle with him when he was working. It is undisputed that Britton possessed a valid Firearm Identification Card ("FID card") for the rifle.

3. Generally, Britton kept the rifle underneath the front seat. The stock portion of the rifle remained in the car during the evening's events, until it was recovered by Detective Thomas Dooley.

4. Springer said that when she saw Britton enter, she pushed an "emergency'; button on her desk to summon aid. Soon after, two detectives came through the front door of headquarters. They secured Britton's rifle. Traumatized, Springer took a break right after the incident. She testified that she could not identify Britton as the person who had entered headquarters on June 30, 1990. All she could see at the time was the rifle. ·

5. The passengers in the car were Tammy Loughlin a/k/a Tammy Carpenter ("Loughlin") and Tyrone Stampley ("Stampley").

6. Both Maloney and Dooley were part of BPD's Drug Control Unit ("DCU").

ty to forty-five minutes. Britton said that most of the ensuing discussion centered around his rifle, not the chase. He showed the officers his FID card, and requested that Maloney and Dooley return the weapon. A background check on the FID card revealed that it was valid. Nonetheless, Maloney and Dooley refused to return the rifle, and told Britton that the police would hold it "for safekeeping." Britton left police headquarters at 6:15 p.m. or 6:20 p.m.

When Britton left police headquarters that evening, he had a copy of an incident report filled out by Dooley. (Trial Exh. 1). Britton had asked for the report so that he could have proof that the officers had taken his rifle. The report narrated the events of the evening, as Britton had related them:

> Randy Britton observed standing in hallway of BPD HQ holding a 22 Caliber rifle A207588 AR–7 EXPLORER in his right hand; rifle taken from Randy Britton who states 2 occupants of red car MA 650 AAP did make threats against his person. Tyrone Stampley DOB 10–24–62 B/M §§ 014525860 Add 25 Weld St. Fram–MA also a W/F Tammy Carpenter W/F MIV rented from Nat Car Rental to a William Murphy. Rifle held for safekeeping. Randy Britton advised to seek asst. at Dist.04 Det's unit.
>
> Firearm ID Card # H–(R)–694455

The "time completed" section on the incident report read 6:15 p.m., just shortly before Britton left. It listed the "type of incident" as "investigation persons" and the victim as "Comm of Mass."

By the time he arrived home, Britton was frustrated and angry. He decided to complain about the way he had been treated at police headquarters. At 8:00 p.m., he called BPD headquarters and spoke with a Sergeant Norman Connor, who gave him the number for the Drug Control Unit ("DCU"). Britton then called the DCU and spoke with Maloney. Britton stated that he told Maloney that the seizure of his rifle was illegal because he had a valid FID card, and, more importantly, he said to Maloney, "I hope I'm not going to have to sue you to get my rifle back." (Day 3, page 47, lines 16–17).

Over the weekend, Britton said he "stewed over [the incident]." (Day 3, page 48, lines 1–2). On July 3, 1990, he went to the BPD Ballistics Unit to get his rifle back. Ballistics personnel informed Britton they did not have it. He then returned to BPD headquarters. He told the desk sergeant that he wanted to see a supervisor. A few minutes later, DCU Deputy Superintendent James Wood ("Wood") appeared. Britton explained to Wood what had happened on June 30, 1990, and said the seizure of his rifle had violated the Fourth Amendment.[7]

Maloney appeared and joined the conversation; Britton reiterated his complaints. Maloney then told Britton there were criminal charges pending against him for assault, based on the statements from Stampley and Loughlin. Britton was shocked. This was the first time Britton had ever heard that he was being charged with an offense of any kind.

In fact, Britton was charged with two counts of assault with a deadly weapon, one on Tyrone Stampley and one on Tammy Carpenter, based on an application for a criminal complaint, dated the same day as his encounter with Maloney—July 3, 1990.

On September 25, 1990, the criminal charges against Britton were dropped for want of prosecution. (Trial Exh. 2). The rifle was not returned to Britton until that date.

### B. *The Officers*

There was apparently a second incident report, which recounted allegations of misconduct by Britton, against Stampley and Loughlin, and which provided the basis for the July 3, 1990, complaint. The central question at trial was when—in relation to Britton's threat to sue to get his rifle back— the second incident report was drafted.

---

7. Wood testified that he recalled that the conversation had occurred, but not its specifics, though he recalled that Britton was "very upset about something" and was "very loud." (Day 4, AM Session, page 39, lines 17–19). During trial, I granted Wood's motion for findings as a matter of law.

Both Dooley and Maloney testified that they spoke to Stampley and Loughlin *together*. According to the officers, Stampley and Loughlin said Britton had pointed his rifle at them while he was driving and threatened to shoot them. Moreover, Loughlin told the officers she was a prostitute and Britton had solicited sex from her on prior occasions, including that evening.

Notwithstanding this testimony, Dooley maintained that Britton had Dooley's incident report *in his possession*—a report which did not mention any misconduct on Britton's part—when he left headquarters. Maloney and Dooley testified that Britton left police headquarters around 6:20 or 6:25 p.m.

### 1. *Dooley's Version*

Dooley testified that he observed Britton's car arrive outside of police headquarters, as he walked into the building.[8] When he entered, he saw Britton standing in the lobby, holding the rifle. He struggled with Britton and took the rifle. Then Dooley removed the clip from Britton's pocket and, taking Britton's car keys, left the police station, drove Britton's car up onto the sidewalk, and removed the rifle stock, a box of ammunition, and the vehicle registration from the car. The rifle itself was unloaded.

Dooley testified that he and Maloney spoke with Stampley and Loughlin before 6:15 p.m., i.e. *before* Britton left. Thus, Dooley said he knew all about the allegations of assault before he gave a copy of his rather innocuous incident report to Britton. Indeed, Dooley testified that he even considered arresting Britton at that time, but decided not to out of concern for Britton's daughter. If he had arrested Britton, Dooley testified that Britton would have been cuffed and jailed. Allison, Britton's daugh-

ter, might then have been sent to Boston City Hospital. (Day 4, PM session, page 47, lines 1–25, page 48, line 12).

### 2. *Maloney's Version*

Contradicting Dooley's account, Maloney testified that he and Dooley spoke with Stampley and Loughlin between 6:20 p.m. and 6:25 p.m., *after* Britton left.[9] At some point after this conversation, Maloney filled out a "supplemental" incident report.[10] This report did not contain an entry for "time completed," nor was it ever given to Britton. It also listed "investigation persons" as the "type of incident," but listed the victim as "Stampley, Tyrone" and included the following entry:

> Additional info aforementioned Tyrone Stampley and Tammy Carpenter stated to officers that the suspect pointed his rifle *out of his auto window at the victims in a threatening manner*. Allegations were made to Det. Dooley and Sgt. Maloney on 6/30/90.

Maloney signed this report as the reporting officer, and Sergeant Vincent K. Donohoe ("Donohoe") signed it as duty supervisor.[11]

Although Maloney testified that he completed the applications for a criminal complaint that same night as Britton's visit to the station—*June 30, 1990*—the date listed on the applications is *July 3, 1990*. Maloney claimed that he did not file the application directly with the Boston Municipal Court ("BMC"); instead, he testified that the application was probably placed in an "out box" at BPD Headquarters, to be sent on to the court.

The official charges against Britton resulted from a criminal complaint filed with the BMC on July 5, 1990. "Peter Mugford/Malo-

---

8. This testimony contradicted a portion of Dooley's answer, which had responded "Admitted" to a paragraph in Britton's complaint that stated, "[w]ithin minutes, Detective Dooley came down from upstairs." The paragraph of Dooley's answer was read to the jury as the admission of a party-opponent under Fed.R.Evid. 801(d)(2).

9. Maloney also said that while interviewing Britton, he learned that Britton had been arrested for solicitation in Texas in 1987.

10. Maloney testified that he filled the report out as soon as he finished speaking with Stampley and Loughlin.

11. Donohoe testified that he did not search for the original report when he signed Maloney's supplemental report. During trial, I granted Donohoe's motion for findings as a matter of law.

ney" is listed as the complainant. (Trial Exh. 4).[12]

Maloney did recall receiving a phone call from Britton on June 30, 1990, later in the night, but said he did not remember its substance.

### C. *Stampley's Version*

Stampley and Loughlin arrived at the police station soon after Britton did. They did not enter BPD Headquarters, but remained outside. Stampley testified at trial. He admitted that he had been chasing Britton on June 30, 1990; Stampley thought Britton was someone he had experienced problems with in jail.[13] Stampley, traveling with Loughlin in his car, arrived at BPD Headquarters soon after Britton.

He denied that Britton ever pointed a rifle at him. He also testified that he never told the police that Britton had threatened him. (Day 3, page 23, lines 12–13).

Rather, Stampley testified that he explained to the police the chase had been a case of "mistaken identity." (Day 3, page 18, line 16). Stampley recalled speaking with the police for about five to ten minutes; he testified that he did not begin speaking with the police until about forty-five minutes after Britton arrived. He admitted, however, that his companion, Loughlin, spoke to the officers longer than he did. Stampley also said that Loughlin was a prostitute.

### D. *Loughlin's Presence at Trial*

■ Loughlin did not testify at trial. The Court issued a trial subpoena, and then an arrest warrant, but she did not appear in court.[14] The defense attempted to introduce the transcript of an examination it had conducted of Loughlin. This examination was not a deposition; while Loughlin was sworn, neither Britton nor anyone representing him was present. As such, it failed to meet the requirements of Fed.R.Evid. 804(b)(1) and could not be admitted.[15]

The jury did hear Loughlin's statements, however, through the testimony of the officers. The Court admitted these statements for non-hearsay purposes—on the grounds that they related to the state of mind of the various officers.[16]

### E. *The Jury Verdict*

The Court submitted five counts to the jury: (1) the federal civil rights statute; (2) malicious prosecution; (3) the Massachusetts civil rights statute; (4) abuse of process; and, (5) intentional infliction of emotional distress. The special interrogatories asked the jury to determine liability for both Maloney and Dooley on all the counts. The jury returned a verdict against Maloney on all counts, except the intentional infliction of emotional distress claim, and awarded damages of $200,000. No liability was found against Dooley. The jury found that while Britton may have demonstrated *prima facie* liability on Dooley's part for abuse of process, Dooley was not the proximate cause of Britton's damages.

### III. *DISCUSSION*

The defendant mounts several challenges specifically to the plaintiff's § 1983 claim. First, the defendant argues that the 42 U.S.C § 1983 count submitted to the jury failed to state a claim for which relief can be granted. Second, the defendant argues that there is insufficient evidence to support this claim. Third, the defendant argues that there were errors in the jury instructions submitted to the jury. I address claims (1) in Section (A)

---

**12.** At trial, Maloney testified that Peter Mugford was the "Boston police officer assigned to the Boston Unit in the court." (Day 4, page 52, lines 6–8).

**13.** At the time of the incident, Stampley was on parole.

**14.** During the trial, the defendants filed a motion for an order of contempt against Loughlin.

**15.** Fed.R.Evid. 804(b)(1): "Former Testimony. Testimony given as a witness at another hearing of the same or a different proceedings, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the part against whom the testimony is now offered ... had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination."

**16.** An appropriate limiting instruction was given regarding the statements.

*infra;* (2) in section (B) *infra;* and claim (3) in section (C)(2) *infra.* In addition, defendant challenges the instructions procedure in general and various instructions on the state claims addressed in section C(1) and (2) *infra.*

### A. *Failure to State a Claim*

■ To assert a viable claim under 42 U.S.C. § 1983, a plaintiff must show that: (1) the conduct complained of was committed by a person acting under color or law; and, (2) the conduct deprived a person of clearly established rights, privileges or immunities secured by the Constitution or laws of the United States. Here, the defendant-officers acted under color of law; the dispute centers around the second requirement—what clearly established federal rights were implicated.

The plaintiff makes two Fourth Amendment claims. First, he claims that his prosecution for assault with a deadly weapon without probable cause, and with all the adverse consequences that flowed from it—his emotional distress, loss of employment [17]—violated his rights under the Fourth Amendment. Second, Britton claims the prosecution was retaliatory: the police officers fabricated criminal charges in retaliation for his assertion of a Fourth Amendment right to the return of his rifle.

The defendant maintains that there is no cognizable § 1983 claim deriving from the prosecution of Britton, relying on a recent Supreme Court decision that limits the scope of rights actionable under § 1983. In *Albright v. Oliver,* 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994), the Supreme Court affirmed a dismissal of the plaintiff's complaint on the grounds that the claim that an arrest without probable cause violated the Due Process Clause of the Fourteenth Amendment could not support a § 1983 cause of action.

In *Albright,* Illinois authorities issued an arrest warrant for the petitioner charging him on the basis of a previously filed information with the sale of a substance which looked like an illegal drug. An informant had originally told the investigating police officer, Roger Oliver, that she had bought cocaine from one John Albright, Jr. The "cocaine" later turned out to be baking powder; the grand jury nevertheless indicted John Albright, Jr. for selling a "look-alike" substance. When the police officer went to serve the arrest warrant, he discovered that John Albright, Jr. was a retired pharmacist in his sixties and decided to investigate further. He then contacted the informant to determine whether the information really meant that the buyer was John Albright's son, Kevin. The informant confirmed that it was Kevin. Kevin Albright surrendered to the warrant, all the while denying his guilt. He was released on bond, with the condition that he not leave the state without the permission of the Court. Shortly thereafter, the Illinois court dismissed the criminal action on the ground that the charge did not state an offense under Illinois law.

Albright's claim was a narrow one. He sued the investigating officer, Detective Roger Oliver, for depriving him of substantive due process rights under the Fourteenth Amendment—his "liberty interest" to be free from criminal prosecution not based on probable cause. Albright did not claim a violation of procedural due process guaranteed by the Fourteenth Amendment. Nor did he claim a

---

17. A large part of Britton's case originally involved the effect the assault charges had on his employment. In 1991, Britton was terminated by his employer Donaldson, Lufkin & Jenrette Securities Corporation, a New York securities firm, when he failed to indicate on a New York Stock Exchange application for securities industry registration whether he had ever been charged with a felony. In its March, 1992, letter to Britton outlining the reasons for his termination, DLJ cited the incident involving the June 30, 1990, assault with a deadly weapon charges filed against Britton as one of three reasons for his termination. (Trial Exh. 37).

During the trial, however, it came to light that Britton failed to turn over any of his tax returns to the defendants, despite repeated requests for their production. As a result, the defendants were denied the opportunity to challenge the employment-related damages. Accordingly, I ruled that Britton was precluded from offering any testimony or evidence regarding any adverse impact the charges may have had on his employment. The only damages at issue in the case related to Britton's emotional distress. I instructed the jury that they should award damages, if any, only for the emotional distress Britton suffered as a result of the prosecution.

violation of his Fourth Amendment rights, "notwithstanding the fact that his surrender to the State's show of authority constituted a seizure for purposes of the Fourth Amendment." 510 U.S. at 271, 114 S.Ct. at 812. The District Court dismissed the suit on the grounds that the complaint did not state a claim under § 1983. The Seventh Circuit affirmed.

### 1. *The Albright Plurality*

The Court's decision was splintered. Four Justices joined one opinion (Rehnquist, C.J., joined by O'Connor, Scalia, and Ginsburg, J.J.). Justice Scalia wrote separately; Justice Ginsburg wrote separately; Justice Kennedy wrote a concurrence, which Justice Thomas joined;[18] Justice Souter also concurred; and Justices Stevens and Blackmun dissented.

Essentially, the plurality held that there is no substantive due process right not to be charged with a crime without probable cause. The Court reiterated that the scope of substantive due process is quite limited; § 1983, it held, is " 'a method for vindicating federal rights elsewhere conferred.' " *Id.* at 271, 114 S.Ct. at 811. (quoting *Baker v. McCollan,* 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 2694 n. 3, 61 L.Ed.2d 433 (1979)). At the base of the Court's holding lay its fear that plaintiffs might use § 1983 to expand rights not otherwise codified in the Constitution, transforming the statute into a cause of action for general unfairness. Hence, in the *Albright* case, the Court suggested that the only pre-existing right implicated was the Fourth Amendment's prohibition against unreasonable seizures, including arrests without probable cause. *Id.* at 274–75, 114 S.Ct. at 813–14. Since Albright alleged no Fourth Amendment violation; the Court affirmed the dismissal of the case.

### 2. *Claims Left Open by Albright*

Unfortunately, "[a]s many courts have observed, in many ways *Albright* muddied the waters rather than clarified them." *Taylor*

*v. Meacham,* 82 F.3d 1556, 1561 (10th Cir. 1996). One court has referred to the melange of opinions as "the *Albright* minefield." *Reed v. City of Chicago,* 77 F.3d 1049, 1052 n. 3 (7th Cir.1996). In addition to the assortment of opinions, the plurality's discussion of the content of a Fourth Amendment claim was dicta, since Albright never alleged such a violation.

What was clear about the opinion, at the very minimum, is this: It instructed plaintiffs to rely on a particular constitutional amendment—typically, the Fourth Amendment—as a gateway to allege a malicious prosecution claim under § 1983. *Id.* at 273, 114 S.Ct. at 812–13. "We have in the past noted the Fourth Amendment's relevance to the deprivations of liberty that go hand in hand with criminal prosecutions." *Id.*[19]

But precisely what the plurality meant to include by its reference to Fourth Amendment claims is not so clear. To be sure, the plurality seems to have envisaged such claims almost exclusively in the context of false arrests. Referring to the potential claims for "pretrial deprivations of liberty," the plurality cited *Gerstein v. Pugh,* 420 U.S. 103, 114, 95 S.Ct. 854, 863–64, 43 L.Ed.2d 54 (1975), which held that the Fourth Amendment required a judicial determination of probable cause for any extended deprivation of liberty following an arrest. *Id.* at 273, 114 S.Ct. at 812–13.

But what of the plaintiff who is not arrested, but only charged, who, as a result, loses employment or suffers other "palpable consequences?" *Albright v. Illinois,* 975 F.2d 343, 346–47 (7th Cir.1992). Is he left without even a Fourth Amendment claim?

Just so, the defendant contends. The defendant asserts the plurality's decision eliminates any cause of action simply because Britton was not arrested. *Id.* at 274, 114 S.Ct. at 813 ("petitioner was not merely charged; he submitted himself to arrest").

---

**18.** Justice Kennedy argued the case should be viewed under *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). Since the deprivation of Albright's rights was random and unauthorized, and an adequate post-deprivation state tort remedy remained, i.e. a state malicious prosecution claim, there was "no basis for inter-

vention under § 1983." *Id.* at 285, 114 S.Ct. at 819.

**19.** The Fourth Amendment was made applicable to the states through the Fourteenth Amendment. *Ker v. California,* 374 U.S. 23, 30, 83 S.Ct. 1623, 1628, 10 L.Ed.2d 726 (1963).

If "seizure" under the Fourth Amendment means only arrest, then Britton could not have been seized because he was not arrested.

This interpretation is deeply troubling. It removes the "heavy weaponry" of federal constitutional litigation, 975 F.2d. at 347, from a situation where a police officer was found by a jury to have concocted probable cause, to silence a citizen's complaint. It permits police officers who go so far as to fabricate charges in an official court proceeding, put a citizen at risk of conviction, and the loss of liberty, jeopardize his employment, consume his time and resources, but stop short of arresting the person, to evade § 1983 accountability. Why wasn't Britton arrested on the night of June 30, 1990? One answer lies in the jury's verdict: Maloney and Dooley did not have probable cause to do so. Using the defendant's approach, the real harm would remain unredressed: the activation of the criminal justice system through invented charges, the blatant abuse of official power, and the significant consequences flowing therefrom.

I do not believe that the *Albright* decision went so far.

### a. *Justice Ginsburg*

Justice Ginsburg's opinion constitutes the only attempt in the *Albright* array to flesh out the scope of a Fourth Amendment claim without an arrest. While Justice Ginsburg joined the plurality opinion, she wrote separately to argue that in considering an *Albright*-like Fourth Amendment claim, "seizure" should be construed broadly.

In Justice Ginsburg's view, a defendant is " 'seized' for trial, so long as he is bound to appear in court and answer the state's charges." *Id.* at 279, 114 S.Ct. at 816. As a result, a plaintiff's claim for unlawful seizure—even viewed through a Fourth Amendment lens—could extend beyond the initial contact with law enforcement and in situations not involving an arrest.

In support of this position, Justice Ginsburg relied on precedents in the common law, as well as the practical implications of pending charges:

A person facing serious criminal charges is hardly freed from the state's control upon his release from a police officer's physical grip. He is required to appear in court at the state's command. He is often subject, as in this case, to the condition that he seek formal permission from the court (at significant expense) before exercising what would otherwise be his unquestioned right to travel outside the jurisdiction. Pending prosecution, his employment prospects may be diminished severely and he may suffer reputational harm, and he will experience the financial and emotional strain of preparing a defense.

*Id.* at 278, 114 S.Ct. at 815.

### b. *Justice Souter*

Justice Souter's concurrence also discusses the claims that remain in the wake of the plurality decision. He pointed out that Albright had failed to show "substantial deprivation of liberty [that stemmed] from the mere initiation of prosecution," rather than from the arrest. *Id.* at 291, 114 S.Ct. at 822. He did, however, suggest there could be an "exceptional cases in which "some quantum of harm occurs in the interim period after groundless criminal charges are filed but before any Fourth Amendment seizure." *Id.*

### c. *Justice Stevens*

In dissent, Justices Stevens and Blackmun contended that "the initiation of a criminal prosecution, regardless of whether it prompts an arrest . . . is of sufficient magnitude to qualify as a deprivation of liberty meriting constitutional protection." *Id.* at 295, 114 S.Ct. at 824. Consequently, they concluded that the Due Process Clause protects individuals "by guaranteeing that no criminal prosecution shall be initiated except on a finding of probable cause." *Id.* at 302, 114 S.Ct. at 828.

### 3. *Decisions After Albright*

Prior to *Albright,* some circuits had recognized a cause of action under § 1983 for violations of substantive due process so long as the case involved some variant of "egregious misconduct." *See, e.g., Torres v. Superintendent of Police,* 893 F.2d 404, 409 (1st Cir.1990) ("egregious misconduct"); *Coogan v. Wixom,* 820 F.2d 170, 175 (6th Cir.1987)

**37**

("egregious misuse"). Recently, however, the First Circuit recognized that *Albright* "would appear virtually to foreclose reliance on substantive due process as the basis for a malicious prosecution claim under section 1983— superseding even *Torres'* very limited tolerance of reliance on substantive due process in this area." *Perez–Ruiz v. Crespo–Guillen,* 25 F.3d 40, 42 (1st Cir.1994).

Courts considering the impact of *Albright* have at once highlighted the primacy of the Fourth Amendment and at the same time suggested that the presence of an arrest is not dispositive. *See, e.g., Whiting v. Traylor,* 85 F.3d 581, 586 (11th Cir.1996) (holding that a plaintiff may assert a malicious prosecution claim under § 1983 so long as she can establish a "concrete violation" of the Fourth Amendment, envisioning an "actual, unlawful, forcible restraint of plaintiff's person"; "an unlawful seizure may include those associated with the prosecution [of charges]"); *Singer v. Fulton County Sheriff,* 63 F.3d 110, 116 (2d Cir.1995) (holding *Albright* does not bar a plaintiff from asserting a federal claim for malicious prosecution under the Fourth Amendment so long as there is some deprivation of liberty consistent with the concept of "seizure").

In sum, *Albright* did not eviscerate all malicious prosecution claims brought under § 1983 that did not involve arrests. Simple vote counting supports this proposition: (a) the plurality allowed for claims under the Fourth Amendment, but did not define what they might consist of; (b) Justice Ginsburg enunciated a "continuing seizure" theory; (c) Justice Souter left room for an "exceptional case"; and, (d) Justice Stevens dissented.

### 4. *Britton's § 1983 Claim*

Britton's § 1983 claim falls within the territory left open by *Albright* in three separate ways: (a) Justice Ginsburg's "continuing seizure" theory; (b) Justice Souter's "exceptional case" theory; and (c) a line of cases—not discussed in *Albright*—which I will refer to as the "retaliation cases." [20]

#### a. *"Continuing Seizure"*

In this case, the criminal prosecution lasted two months. The charges against Britton were dismissed for want of prosecution. In between, and thereafter, the prosecution for a serious felony had a substantial deleterious impact on Britton's life—including the loss of time and self-esteem, as well as the eventual loss of a job.[21] The following court dates were scheduled in the case: August 3, 1990; August 30, 1990; and September 25, 1990. *See* Trial Exh. 3. While Britton was not required to post bail, he did have to report for these court dates, or face the consequences.

According to the logic of Justice Ginsburg's concurrence, this two month period constituted a "seizure" of Britton. The police officers' decision to bring the mechanisms of the criminal justice system to bear on Britton implicates all of Justice Ginsberg's concerns. As a result of Maloney's conduct, a summons and complaint issued for Britton. The complaint effected a seizure since it involved a restraint on liberty. *Id.* Legal proceedings cannot begin until the state accomplishes this initial seizure; without the compulsive force of the state behind the summons and complaint, Britton would not have had to appear in court. Until Britton was free of the obligation to appear when and where the state commanded, under threat of contempt, the seizure continued.[22]

---

**20.** Britton has no procedural due process claim. The availability of an adequate state remedy in Massachusetts for malicious prosecution eliminates this claim. *Noel v. Town of Plymouth,* 895 F.Supp. 346, 353 (D.Mass.1995).

**21.** While I did not permit Britton to present any employment-related damages to the jury, see n. 18, infra, he was permitted to testify about the emotional impact of the charges and their sequellas. The evidence was that these charges formed at least part of the basis for Donaldson, Lufkin, and Jenrette's decision to terminate Britton's employment. *See* Trial Exhs. 34 and 37.

**22.** In Justice Ginsburg's view, Britton was "seized" from July 3, 1990, until September 25, 1990, when the state could no longer compel his presence for court proceedings. Post-*Albright* courts have addressed Justice Ginsburg's position. *See Singer v. Fulton County Sheriff,* 63 F.3d 110, 117 (2d Cir.1995) (holding post-arraignment deprivations of liberty could satisfy the requirement of seizure); *Cyprus v. Diskin,* 936 F.Supp. 259, 263 n. 3 (E.D.Pa.1996) (noting Justice Ginsburg's "quite persuasive" observations); *but see Wilkins v. May,* 872 F.2d 190, 194 (7th Cir.1989) (rejecting the "continuing seizure" theory); *Whiting v. Traylor,* 85 F.3d 581, 584 (11th Cir.

Britton has a Fourth Amendment "right to be free of unreasonable or unwarranted restraints on personal liberty." *Singer*, 63 F.3d at 116. The criminal prosecution interfered with this right.

### b. *An "Exceptional" Case*

Britton's case also features sufficiently unique circumstances to place it into the category of "exceptional cases" exempted by Justice Souter. While the short length of the pending charges might initially seem less than onerous, the harm is clearer when considered in light of the officers' retaliatory motive, discussed below; indeed, Britton endured "a harm of constitutional proportions." *Singer*, 63 F.3d at 116.[23]

### C. *Retaliation*

Another right implicated in this lawsuit is the right not to suffer retaliation for exercising or threatening to exercise constitutional rights. Different courts place the source for this right in different constitutional amendments. *See, e.g., Hall v. Ochs*, 817 F.2d 920,

925 (1st Cir.1987) (noting that access to the courts to redress civil wrongs is often treated as a First Amendment right); *Duvall v. Sharp*, 905 F.2d 1188, 1189 (8th Cir.1990) (holding that actions taken to retaliate for filing a civil rights lawsuit may violate First and Fourteenth Amendment rights).[24]

Britton could have sued under § 1983 to get his rifle back.[25] Britton was legally allowed to file a complaint to challenge a seizure; he was legally allowed to verbally complain as well. *See Hall v. Ochs*, 817 F.2d 920, 922 (1st Cir.1986) (holding that while Hall "clearly had a Fourth Amendment right to be free from unreasonable seizures of his person," he also had a "First Amendment right to access to the courts to vindicate his rights secured under state and federal law."); *Smart v. Board of Trustees*, 34 F.3d 432, 434 (7th Cir.1994) (holding that "[a]ny form of official retaliation for exercising one's freedom of speech is actionable as an infringement of that freedom. Malicious prosecution has been held to be a form of harassment of

1996) (noting "questions about the [continuing seizure] theory" but declining to reach a final decision)

23. I admit that I find it difficult to imagine a situation where pending criminal charges would not exact severe harm. "The initiation of a criminal proceeding, regardless of whether it prompts an arrest, immediately produces 'a wrenching disruption of everyday life.'" *Albright*, 510 U.S. at 295–96, 114 S.Ct. at 824 (Stevens, J., dissenting) (quoting *Young v. United States ex rel. Vuitton et Fils*, 481 U.S. 787, 814, 107 S.Ct. 2124, 2141, 95 L.Ed.2d 740 (1987)).

24. As the Seventh Circuit has noted, "A First Amendment action is still possible [after *Albright*] because the First Amendment has been incorporated into the Fourteenth Amendment as a liberty interest." *Lawshe v. Simpson*, 16 F.3d 1475, 1479–80 (7th Cir.1994). The fact that the Supreme Court focused on the role of the Fourth Amendment in *Albright* does not mean that claims based on other amendments are precluded. "It is theoretically possible. for a plaintiff to premise a malicious prosecution claim on some other constitutional right." *Singer*, 63 F.3d at 115 n. 5.

25. The rifle was seized pursuant to a Boston Police Department rule. Rule 311 of the BPD Rules and Regulations outlines the procedure which Boston police officers must follow "[w]henever a firearm comes into the possession of a police officer, while on duty, by whatever

means ..." In essence, Rule 311 requires that a police officer who comes into possession of a firearm must complete an incident report and submit the firearm to the Boston Police Department Ballistics Unit. The Ballistics Unit is charged with maintaining custody of a seized firearm until it is returned to its owner or destroyed by court order.

The plaintiff claimed that the rule itself was unconstitutional since it requires police officers to seize any firearm which "comes into [their] possession," even when there is no probable cause for such a seizure. On the defendants' motion to dismiss, I held that, regardless of the interpretation of the rule, which was ambiguous on its face, the complaint was sufficient to raise the issue of its unconstitutional application. On summary judgment, however, based on a fuller record, I concluded that the facts suggested no basis for arguing that the initial taking of the rifle was unconstitutional, under the circumstances the need to check the *bona fides* of his possession; his story of strangers chasing him, etc. Its retention after the police confirmed a lawful FID and indeed, parts of his story, is another matter.

But the ultimate merits of Britton's seizure claim are irrelevant. In any event, even if the rifle was wrongfully held between June 30, the date of the incident, and July 3, the date of the criminal complaint, no damages flowed from that for Britton. The issue is his right to *challenge* the initial seizure, and the officers' failure to return the weapon even after it was clear that it was lawfully possessed by Britton.

which a plaintiff can complain on First Amendment grounds." (citation omitted)).

The defendant claims that the Fourth Amendment is a "protective" right which cannot be chilled. This analysis fails to appreciate the logic of the retaliation cases. Unquestionably, the rights secured by the Fourth and First Amendments are "chilled" when valid challenges to police activity are met with the institution of criminal charges. Pre-*Albright*, the First Circuit implied as much:

> [The plaintiff's] theory seems to be that defendants conspired to deprive him of his section 1983 right of action to seek redress for the unconstitutional use of force, and we may assume, without deciding that such an object, sufficiently advanced, could have amounted to an actionable deprivation of federally protected rights.

*Landrigan v. Warwick*, 628 F.2d 736, 742 (1st Cir.1980). Nothing in *Albright* casts doubt on this position. Indeed, cases pre-*Albright* and post-*Albright* suggest the same theme. *See also Gehl Group v. Koby*, 63 F.3d 1528, 1534 (10th Cir.1995) (holding charges filed in retaliation for the exercise of a constitutionally protected right are actionable under § 1983); *Gonsalves v. New Bedford*, 939 F.Supp. 921, 927 (D.Mass.1996) (holding that when a defendant begins a cover-up to keep a civil suit from being filed and continues the cover-up once a case has commenced, a plaintiff may be entitled to recover under § 1983 for denial of adequate access to the courts); [26] *Cantarella v. Kuzemchak*, 36 F.3d 1102, 1994 WL 529530, *1 n. 2 (9th Cir.1994) (unpublished opinion) (holding that exception for malicious prosecution under § 1983 exists when the prosecution "is conducted with the intent to deprive a person of equal protection of the laws or is otherwise intended to subject a person to a denial of constitutional rights.") (citation omitted); *Duvall v. Sharp*, 905 F.2d 1188, 1189 (8th Cir.1990) (holding arrest allegedly made in retaliation for filing a civil rights lawsuit sufficient to state a cause of action for retaliatory conduct in violation of plaintiff's First and Fourteenth Amendment rights); *Hampton v. Hanrahan*, 600 F.2d 600, 622 (7th Cir.1979), *rev'd in part on other grounds*, 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980) (holding that plaintiffs stated a claim for a violation of § 1983 when they alleged the defendants conspired to bring false charges in order to frustrate any possible redress and to conceal the true character of their activities).

▮ The defendant argues that Britton's claims of illegal detention and illegal seizure were disposed of before this trial, depriving Britton of any suitable constitutional "peg" within *Albright*'s limits. I do not agree. On the evening of June 30, 1990, Maloney could not have known that Britton's seizure claims would eventually be unsuccessful, so the "peg" on which Britton's malicious prosecution claim hangs is still a valid one.[27] Fundamentally, this aspect of Britton's case—the right to enforce Fourth Amendment rights—removes it from the con-

**26.** Courts have also endorsed this theory in prisoner civil rights cases. *See Milhouse v. Carlson*, 652 F.2d 371, 373 (3d Cir.1981) (disciplinary proceedings allegedly brought against a prisoner in retaliation for having filed a civil rights lawsuit "if proven at trial, would establish an infringement of Milhouse's first amendment right of access to the courts."); *Goff v. Burton*, 7 F.3d 734, 736 (8th Cir.1993) (same holding in context of retaliation for an inmate's lawsuit challenging the conditions of confinement); *Smith v. Maschner*, 899 F.2d 940, 947 (10th Cir.1990) (same holding in context of retaliation for prisoner's "ongoing litigation and jailhouse lawyering").

**27.** In *Albright*, Justice Ginsburg noted that the action against the charging officers may be "anomalous" since the actual prosecution is not accomplished by the officers. 510 U.S. at 279 n. 5, 114 S.Ct. at 816 n. 5. This is not so when a jury has found that the charges were fabricated in an effort to squelch a threatened lawsuit. Officers who fabricate allegations in a criminal case cannot cloak themselves in the guise of prosecutorial immunity. *Senra v. Cunningham*, 9 F.3d 168, 173 (1st Cir.1993) ("[t]he chain of causation is broken if the filing of the information by the attorney at the state Attorney General's office was free of pressure or influence exerted by the police officers or knowing misstatements made by the officers to the Attorney General's office."). Here, Maloney completed the application for a criminal complaint, falsely, the plaintiff alleged, and it was forwarded to Peter Mugford, the officer assigned to the Boston courts. A summons and complaint issued on July 5, 1990. *See* Trial Exhs. 3 and 4.

cerns of the plurality in *Albright.*[28] The right which forms the basis for Britton's malicious prosecution claim was explicitly guaranteed by a specific textual command of the constitution, plainly "elsewhere conferred" within the meaning of *Albright.*[29] "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . ." U.S. Const., amend. IV. Significantly, the amendment is broadly written. The drafters prohibited more than unreasonable arrests, they prohibited unreasonable "seizures." *See, e.g., Jean v. Collins,* 107 F.3d 1111, 1115 (4th Cir.1997) (holding that *Albright* does not preclude a lawsuit based on *Brady v. Maryland* violations since "the right to disclosure of exculpatory evidence is grounded in the Due Process Clause itself.").

Viewed as the jury saw this case—as a violation of the plaintiff's Fourth Amendment rights—Britton's suit is not a diffuse substantive due process claim that the police treated him unfairly or engaged in a personal vendetta. *E.g., Gunderson v. Schlueter,* 904 F.2d 407 (8th Cir.1990) (refusing to find a due process violation where officer had brought criminal charges against a resort owner as a result of a personal vendetta). The plaintiff claims the defendants, police officers, brought charges against him in re-

taliation for his invocation of the Fourth Amendment. As such, it is a claim that strikes at the heart of both the civil rights statute and the underlying constitutional right.

## B. Sufficiency of the Evidence

■ A Rule 50(b) motion for judgment as a matter of law, formerly known as a motion for judgment notwithstanding the verdict, cannot be made unless a prior motion for judgment as a matter of law, i.e. a motion for directed verdict, was properly brought before the court during trial.[30] *Javelin Investment v. Municipality of Ponce,* 645 F.2d 92, 94 (1st Cir.1981). In this case, the defendant properly raised such a motion.

■ Judgment as a matter of law may be granted only when the evidence, viewed in a light most favorable to the non-movant, is such that reasonable persons could reach but one conclusion. *Putnam Resources v. Pateman,* 958 F.2d 448, 459 (1st Cir.1992); *Wagenmann v. Adams,* 829 F.2d 196, 200 (1st Cir.1987). The defendant has failed to meet this standard.

■ Maloney has also moved, pursuant to Fed.R.Civ.P. 59, for a new trial. The standard for a new trial motion is often confused

---

**28.** *See Gehl Group,* 63 F.3d at 1535 n. 8 (discussing retaliation theory of malicious prosecution and noting *"Albright v. Oliver* . . . [is] not to the contrary . . . [the case] only involved challenges to police conduct based on the lack of probable cause and not based on the alleged abridgement of any other specific constitutional rights.")

**29.** The First Amendment is also a right "elsewhere conferred." "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or of the right of the people peaceably to assemble, and petition the Government for a redress of grievances." U.S. Const., amend. I. Indeed, "a decision to prosecute which is motivated by a desire to discourage protected speech or expression violates the First Amendment and is actionable under § 1983." *Wolford v. Lasater,* 78 F.3d 484, 488 (10th Cir.1996).

This may also implicate yet another constitutional command: the Equal Protection Clause. *See Gehl Group v. Koby,* 63 F.3d 1528, 1538 (10th Cir.1995) (discussing plaintiffs' claim that they were singled out for prosecution because of their

exercise of a fundamental right; "[s]uch differential treatment could implicate equal protection concerns, just as it could First Amendment concerns.").

The plaintiff was *pro se.* He did not use the words First Amendment or Equal Protection. He *did* allege retaliation for the exercise of his constitutional rights. *See* Complaint at ¶ 58 ("Because I objected to the illegal and unreasonable searches and seizures, and complained, first to Maloney and then to . . . Wood, I was falsely accused by Maloney."). Since I have found that the Fourth Amendment adequately states a claim, I need not address whether this claim could have been cognizable under a First Amendment or Equal Protection theory as well.

**30.** The 1991 amendments to Federal Rule of Civil Procedure Rule 50(b) eliminated the distinction between a pre-verdict motion for directed verdict and a motion for judgment notwithstanding the verdict. Both motions are now known as motions for judgment as a matter of law. *Putnam Resources v. Pateman,* 958 F.2d 448, 459 n. 7 (1st Cir.1992).

with that of a motion for judgment as a matter of law, but they are not the same. A trial court may grant a new trial "if [s]he is of the opinion that the verdict is against the clear weight of the evidence, or is based upon evidence which is false, or will result in a miscarriage of justice, even though there may be substantial evidence which would prevent direction of a verdict." *Aetna Casualty & Surety Co. v. Yeatts*, 122 F.2d 350, 352–53 (4th Cir.1941). *See Coffran v. Hitchcock Clinic, Inc.*, 683 F.2d 5, 7 (1st Cir.), *cert. denied*, 459 U.S. 1087, 103 S.Ct. 571, 74 L.Ed.2d 933 (1982) (citing test as whether the verdict is against "the clear weight of the evidence"); *Borras v. Sea–Land Service, Inc.*, 586 F.2d 881, 887 (1st Cir.1978) (citing test as whether the verdict is against "the great weight of the evidence"). Here too, however, the defendant has failed to meet the standard.

### 1. *§ 1983 Claim and Malicious Prosecution*

■ The starting point for most post-*Albright* decisions is the common law tort of malicious prosecution, coupled with the violation of a pre-existing right, discussed above. *See Calero–Colon v. Betancourt–Lebron*, 68 F.3d 1, 3 (1st Cir.1995).[31] The common law elements of malicious prosecution include the following: (1) the defendant must have instituted a criminal action against the plaintiff; (2) the prosecution must have ended in the plaintiff's favor; (3) there must have been an absence of probable cause to initiate the criminal proceeding; (4) the defendant must have acted maliciously. *Id.* at 3 n. 5. Tested by the standards of Rules 59 and 50, Britton established all these elements, as well as the violation of his Fourth Amendment rights.

### a. *Retaliatory Motive*

■ A crucial fact in Britton's favor was that Maloney and Dooley testified to different chronologies for the evening of June 30, 1990. The disparities were key because both agreed that Britton was not informed of the assault allegations against him before he left police headquarters. Maloney said Britton was not informed of the assault charges because Maloney did not learn of the threats until after Britton had left BPD Headquarters. In contrast, Dooley testified that he had all the information he needed to file charges and make an arrest before Britton left headquarters; he simply chose not to inform Britton. Dooley's incident report, given to Britton at 6:20–6:25 p.m., did not mention any allegations of assault.

But the Dooley report, obtained by Britton before he left BPD Headquarters, included personal information regarding Stampley and Loughlin, i.e. their addresses and driver's license numbers. As such, it confirms Dooley's chronology of the interviews that evening: Dooley *had* to have spoken with Stampley and Loughlin at least once *before* Britton left that evening because his report included this information. The report did not, however, contain any of the allegations Stampley and Loughlin supposedly made against Britton, i.e. solicitation of a prostitute or assault with a dangerous weapon. A reasonable jury could have viewed the failure to report this information on Dooley's report as suspicious, supporting Britton's argument that the charges were fabricated after he left and after he had demanded the return of his property.

Further, Dooley's explanation for the gaps in the report—its failure to describe the accusations against Britton—could well have been unpersuasive to a reasonable jury.[32] He said he wanted to be unbiased in his report, and he advised Stampley and Loughlin to go to the District 4 office and swear out a complaint against Britton. (Day 1, page 33, lines 24–25). In fact, Dooley said "they [Stampley and Loughlin] were going to go down to District 4 and fill out *their own* police report." (Day 1, page 34, line 13) (emphasis added). This report, the only Britton had when he left headquarters, Dooley said, reflected the statements Britton made, nothing more. But the report listed "investigation persons" as its "type of inci-

---

**31.** This section of the discussion applies with equal force to Britton's § 1983 claim and his state law malicious prosecution claim.

**32.** Maloney's explanation, as noted above, was that the officers did not learn about the assault accusations until after Britton left headquarters.

dent." More importantly, the victim was not listed as Randy Britton, but as the "Comm of Mass"—despite the fact that the report was supposed to reflect the statements that Britton had made. (Trial Exh. 1).[33]

Dooley never filled out another report detailing the allegations made by Stampley and Loughlin. Moreover, when he filled out the ballistics report later on the evening of June 30, 1990, concerning Britton's rifle, he noted that the "criminal charges pertaining to Ballistics Evid" as "ill. poss. firearm," not assault with a deadly weapon. (Trial Exh. 11). In any event, since Britton had an FID card for the rifle, illegal possession was an impossible charge.

A reasonable jury could have found the timing of the application problematic. If Maloney completed the supplemental incident report on June 30, 1990 (the report alleging a crime), why was it undated? And if Maloney completed the criminal complaint applications on June 30, 1990, why does the date on the applications read July 3, 1990? [34]

Deferring the question of the report, it is also unclear why the police did not even tell Britton about the accusations before he left BPD headquarters. As far as Britton knew, when he left the building that evening, the police had taken his rifle, for "safekeeping"— a weapon which they conceded was legally in Britton's possession when he entered BPD Headquarters. On June 30th, nothing else occurred. This fact, combined with the lack of a "time completed" entry on Maloney's supplemental incident report, could well have suggested to a reasonable jury that the defendants decided to bring the charges after Britton left.

Indeed, on this record the jury was entitled to infer that Britton's litigious phone call triggered the decision to institute the charges. Britton threatened litigation in a phone call on the day of the incident, June 30, 1990: "I hope I'm not going to have to sue you to get my rifle back." By the July 3, 1990, visit to police headquarters, he was

more explicit—that the rifle's seizure violated the Fourth Amendment.

Finally, Stampley's testimony directly contradicted the officers' statements. Not only did Stampley testify that he chased Britton on that night—an explanation making Britton's bizarre story entirely plausible—he also said he never told the officers that Britton had threatened him with a rifle. While the defendant introduced Stampley's criminal record as impeachment (Trial Exh. 28), a reasonable jury could have concluded he was telling the truth. No evidence was introduced to suggest that Britton had offered Stampley any deals or inducements for his testimony. The jury could simply have decided that Stampley was a more credible witness than either Dooley or Maloney.

Some of the physical circumstances also favored the plaintiff's case. If it was Britton who had threatened Stampley and Loughlin, why would he seek refuge in BPD Headquarters? It seems an unlikely place to go if one has just committed a crime.

The defendant emphasizes that Stampley and Loughlin also traveled to BPD headquarters, arguing their presence at the station makes it improbable that they had chased and threatened to kill Britton. But Stampley *admitted* that he had been chasing Britton, so the fact that Stampley chose to follow Britton to police headquarters only supports Britton's story.

A jury could also have considered the fact that Britton was not arrested to be significant, suggesting that the defendants had no information indicating that he had assaulted anyone that evening. Indeed, on February 11, 1997, during deliberations, the jury submitted five questions, one of which was, "Are people normally arrested for assault with a dangerous weapon?" (Trial Record, Docket entry # 189). While the defendants stressed the fact that Britton entered police headquarters with an unloaded weapon, the officers admitted that in their view, under the circumstances, this was not illegal. In any

33. In Maloney's report, the victim is listed as "Stampley, Tyrone."

34. Maloney explained that he had placed the applications in the out box to be sent to Peter

Mugford, the officer assigned to the Boston courts. This is, of course, one explanation for the delay, which a reasonable jury was not obliged to accept.

case, Britton was never charged with illegal possession of a firearm. Maloney testified that he found Britton's story unbelievable and that he felt the events of the evening inspired "a certain urgency, a certain need to bringing this before the court." (Day 6, page 57, lines 16–18).[35] Nonetheless, Maloney's urgency and skepticism did not translate into arresting Britton.

A reasonable jury could have asked the question: If Britton was so dangerous, and the officers were so worried that violence would ensue if he was permitted to keep the rifle, why allow him to leave the station at all with his five-year old daughter in tow?

### b. *Termination in the Plaintiff's Favor*

The defendant argues that Britton did not prove that the prosecution terminated in his favor. Under *Wynne v. Rosen*, 391 Mass. 797, 464 N.E.2d 1348 (1984), a plaintiff can meet this prong when "the district attorney formally abandons the criminal proceedings by a *nolle Prosequi* or a motion to dismiss." *Id.* at 800, 464 N.E.2d 1348. The reasons for the government's abandonment must be consistent with the "innocence of the accused." *Id.*[36]

The charges against Britton were dismissed for want of prosecution. *See* Trial Exhibit 2 (noting "Dismissed FWOP"). Stampley and Loughlin did not appear. Concededly, dismissal on a procedural or technical default does not meet the requirements for a termination in the plaintiff's favor. *Id.* But dismissal for want of prosecution is neither procedural or technical. *See Noel v. Town of Plymouth*, 895 F.Supp. 346, 355 (D.Mass.1995) (holding that "[d]ismissal of a case because of a named defendant's [sic witness'] failure to appear or because of the destruction or loss of exculpatory evidence

does not constitute a procedural or technical default.").[37]

Want of prosecution is also neither a vague nor inadequate ground for dismissal. *See De Sa v. Sniger*, 2 Mass.App.Ct. 819, 819, 309 N.E.2d 503 (1974) (declaration which alleged only that a criminal complaint had been dismissed failed to adequately specify the nature of the dismissal and did not show termination in plaintiff's favor). There were no other possible charges. *See Guay v. Kappelle*, 70 F.3d 1252 (1st Cir.1995) (holding doctor could not show underlying prosecution had terminated in his favor; though original plaintiff had lost on the negligence claim, he had still prevailed on a lack of informed consent theory). Nor was the dismissal undermined in any way by evidence of a settlement with the defendant. *See Simmons v. City of Brockton*, 93–12201 (D.Mass., Dec. 15, 1994), 1994 WL 725181, *1 (holding plaintiff could not show termination in her favor since underlying criminal case was dismissed when she stipulated that she would not run an illegal boarding house in the future). The charge was serious—it had been pending only two months; the final dismissal occurred on the date of the third court appearance. Yet, the prosecutor never sought leave to refile the charges or ask for a continuance to secure the witness' attendance. Dismissal in these circumstances favors Britton and is consistent with his innocence. Though the Massachusetts courts have not explicitly dealt with a malicious prosecution dismissed for want of prosecution, a parallel New York case is instructive:

> While there is certainly a distinction between a voluntary or formal abandonment by a prosecutor and a dismissal brought about by his neglect or unexcused failure to proceed, the difference is more apparent than real, for in both circumstances the

---

**35.** The defendant continues to underscore the "violent and dangerous" confrontation that he believed had occurred before Britton arrived at headquarters that night. But Stampley testified that he was the person who had initiated any confrontation, and that Britton did not use his rifle to threaten anyone.

**36.** In *Wynne*, the SJC formally abandoned the old Massachusetts rule—which held that a *nolle prosequi* was insufficient for favorable termination—in light of the "overwhelming support"

for the more modern position that a *nolle Prosequi* was sufficient. *Id.*

**37.** Britton testified that the district attorney did not respond to a bill of particulars filed by his counsel. He also testified that Stampley and Loughlin—the complaining witnesses—failed to appear in court; there was no contrary testimony on this issue. The BMC court docket, Trial Exh. 2, simply says "Dismissal FWOP."

criminal charges have been terminated by the prosecutor's non-pursuit of the charges against the accused. In each case, the failure to proceed to the merits compels an inference of such an unwillingness or inability to do so as to imply a lack of reasonable grounds for the prosecution.

*Loeb v. Teitelbaum,* 77 A.D.2d 92, 432 N.Y.S.2d 487, 494 (1980), modified on other grounds, 80 A.D.2d 838, 439 N.Y.S.2d 300 (1981) (cited with approval in *Wynne v. Rosen,* 391 Mass. 797, 800, 464 N.E.2d 1348 (1984)).

### 2. *Abuse of Process*

■ The "essential elements" of the state law tort of abuse of process are that: (1) process was used; (2) for an ulterior or illegitimate purpose; (3) resulting in "damage." *Beecy v. Pucciarelli,* 387 Mass. 589, 595–96, 441 N.E.2d 1035 (1982). Such an action can lie against police officers who "use a lawful criminal process to accomplish an unlawful purpose." *See Santiago v. Fenton,* 891 F.2d 373, 388 (1st Cir.1989). Even though Britton need not prove the groundlessness of the defendants' actions to support his claim for abuse of process, the SJC has stated, "[t]hat the person commencing the litigation knew or had reason to know his claim was groundless is relevant, however, as tending to show that the process was used for an ulterior purpose." *Fishman v. Brooks,* 396 Mass. 643, 652, 487 N.E.2d 1377 (1986).

■ The Supreme Judicial Court has also stated that an abuse of process claim fails when plaintiff does not demonstrate an "ulterior purpose." *Beecy,* 387 Mass. at 589, 441 N.E.2d 1035 (defendant's erroneous commencement of a collection action against plaintiff was insufficient to show the requisite ulterior purpose for a claim of abuse of process).

■ Again, the evidence before this Court was sufficient for a jury to find for Britton on the abuse of process claim. Charges were instituted; probable cause was lacking; and the nexus between Britton's threat and the filing of the charges provides the ulterior purpose.

### 3. *State Civil Rights Claims*

■ The Massachusetts Civil Rights Act is violated when a defendant, through "threats, intimidation, or coercion" seeks to interfere with the plaintiff's "exercise or enjoyment·of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth." Mass. Gen. Laws, ch. 12, § 11I. The close nexus between Britton's threat to sue and the filing of charges supports the jury's verdict that the defendant filed charges in an effort to intimidate the plaintiff into dropping any possible claims. Here too, Britton provided the jury with reasonable grounds upon which they could find that Maloney violated Britton's state civil rights.

### C. *Errors in the Jury Instructions*

Pursuant to Maloney's motion for a new trial under Fed.R.Civ.P. 59, counsel makes a number of challenges to the instructions.

The defendant first makes what can be characterized as procedural challenges: He claims that there was no charge conference within the meaning of Rule 51, Fed.R.Civ.P., that written instructions were improperly submitted to the jury after they had been deliberating for two days, and that an amended verdict slip was improperly distributed, as well. In fact, not only was there a charge conference that met the requirements of the rule, counsel was given opportunities to object to and shape the instructions far, far, beyond that required by the rule or indeed, justified by his conduct. Counsel filed instructions late, repeatedly sought to raise objections during deliberations that he had never raised at side bar after the jury had been instructed, or even on the first day of deliberations with the Court's written instructions in hand, and now makes arguments never mentioned before at all, mischaracterizing the record, the rulings, and the issues to boot. The fact of the matter is that the Court adopted many of his objections—however ill timed or inappropriately presented.

■ Counsel also challenges the content of certain of the instructions, apart from

procedural issues. But these challenges cannot be separated from counsel's actions or more appropriately, his inaction. It is plain that the Court cannot consider on a motion for a new trial objections never raised at all during the trial. While the Court indulged counsel for Maloney while the jury was deliberating, when corrections or amendments to the charge could be still made, that indulgence has to stop. If counsel did not preserve the issue, it is gone.

If additional instructions responsive to counsel's objections were delayed, it is because counsel failed to mention them in a timely fashion. In any event, nothing in the record suggests that whatever "corrections" were given were too late.

If any party to this action is taking action too little, too late, it is counsel for the defendant.

### 1. *Procedures Followed*

#### a. *Charge Conference*

Defendant claims that "the Court provided its initial verbal instruction to the jury without any prior conference regarding what the substance of the instruction would be." Motion of Defendant, Patrick J. Maloney, For a New Trial or Remittitur, p. 4.

The claim is wholly without merit. Either counsel was not paying attention, or makes arguments without regard to what Rule 11, Fed.R.Civ.P. describes as a "belief formed after reasonable inquiry [that it is] it is well grounded in fact."

On Monday, February 10, 1997, at 10:10 a.m. the Court held a charge conference with the parties which met all of the requirements of Rule 51. (Day 5, pp. 8–27.) Rule 51 provides:

> At the close of the evidence or at such earlier time during the trial as the Court reasonably directs, any party may file written requests that the Court instruct the jury on the law as set forth in the requests. The court shall inform counsel of

its proposed action upon requests prior to their arguments to the jury.

Typically, the requirement that counsel be "informed" about the proposed instructions is met by an oral charge conference in which the Court outlines its proposed instructions in order to give the parties an opportunity to object in a timely fashion. The Court did precisely that.[38]

In fact, the Court's usual procedure is far more elaborate but because of counsel's total disregard of the rules, the Court was unable to follow it in toto. Still, usual procedure or not, counsel had myriad opportunities to object—pre-instruction, post-instruction, and during jury deliberations but pre-verdict.

#### i) The Court's Usual Procedure

The Court's obligation to instruct so that jurors can understand, and the Court's obligation to instruct on issues outlined by the Courts of Appeals sometimes collide. The safest procedure is to use the language of the appellate decisions; at the same time, that language oftentimes is far too complex for a lay audience.

Accordingly, to accommodate both obligations, the Court submits a written draft of the instructions composed directly on the Court's computer, to counsel. (Indeed, at the pre-trial conference, counsel are asked to submit their jury instructions on disk so that their instructions can be "cut and pasted.") A written draft is distributed as early before closing argument as possible. Where possible, draft written instructions are faxed to the parties the night before the charge conference.

The purpose of this procedure is several fold. It enables the Court to translate legal language into simpler terms, with the approval of counsel. It enables counsel to weigh in, not only on the subject matter of the instructions, but also their language, the order of their submission, etc. It leads to a more informed charge conference, with all parties dealing with the same script. Then,

---

**38.** Counsel for the defendant announced to the Court that the usual procedure for all courts was to give out written draft instructions to the parties. Day 7, pp. 10–12, 15. He made the same comment in his written submission. The short answer is that counsel did not know what he was talking about. The usual procedure, and the only one required by the law, was an oral conference.

after the Court has read from the instructions, the written version is distributed for counsel's final approval,[39] before submission to the jury. What the jury gets is more than simply a transcript of the Court's remarks. It gets the instructions with a table of contents, and formatted to make them easier to read.

The parties have several chances to review the instructions: before the charge conference when they get the draft written instructions; at the charge conference when the document is reviewed; at side bar after the instructions; and before the submission of instructions in written form to the jury.

It was especially important to follow this procedure in the *Britton* case. Mr. Britton was *pro se*. The Court relied on defendant's counsel to produce a full set of instructions in a timely fashion, and to correct errors inadvertently made. Counsel for the City did not cooperate at all.

### ii) *The Britton Procedure*

 The Court's pretrial order required a pretrial memo to be submitted to the court five days before trial, which memo was to include jury instructions. Trial started on February 3, 1997. Not surprisingly, the *pro se* plaintiff did not comply. What was particularly disconcerting is that counsel for the defendant did not bother to either.

On Thursday, February 6, 1997, both sides were asked for their instructions. Defense counsel stated: "I have jury instructions. They're back at the office, naturally." The plaintiff and defendant promised to file instructions the next day.

Instead, counsel for the defendant finally submitted instructions at 5:00 p.m. on Friday, February 7, 1997. As a result, the Court was unable to prepare written instruc-

tions in advance for submission to counsel. Supplemental instructions were submitted in the morning of February 10, 1997, moments before the closing arguments were to begin.

At the charge conference, the Court outlined its proposed instructions. The defendant and plaintiff asked for some changes and requested that the Court take judicial notice of certain items. The Court read the instructions from a draft which the Court had prepared over the weekend, with additional instructions from the charge conference. The Court made it clear that it would retype the instructions as she had read them, for submission to the jury.

After the jury was instructed, the parties were given an opportunity to object at side bar. Defendant made very, very limited objections, at that time, pursuant to the rule, *all of which the Court adopted.*[40] (See below.) No objections were made to the verdict slip at all.

The jury asked to be recessed early on Monday, February 10, 1997, shortly after being instructed. Before proceedings closed, counsel were informed that the draft written instructions would be faxed to counsel that afternoon, for submission to the jury the next day.

On February 11, 1997, counsel was asked to approve the instructions as written.[41] Apart from typographical errors, the only difference between the verbal instructions and the written instructions was that the latter had a more elaborate instruction on "malice." As noted below, while counsel had not provided instruction defining malice, he nevertheless objected to the Court's failure to give one at side bar. When he then made oral suggestions about how malice should be defined, the Court accepted them. On reflec-

---

**39.** This is intended to make certain that the Court's oral remarks did not diverge from the written comments, that there are no typographical errors in the written instructions, and that the format is appropriate.

**40.** He objected to the malice instruction (see below) and offered refinements on the Court's probable cause instructions and instructions on battery. All of his suggestions were adopted.

**41.** On February 11, 1997, the Court convened again in the morning. Due to some miscommu-

nication with the Court's staff, however, the plaintiff was delayed and was not able to be present when the Court greeted the jurors and sent them to deliberate. Since the plaintiff was not present to acquiesce to the submission of the instructions in written form, the Court would not distribute them. It informed the jury that it would not receive the instructions as a result of secretarial problems. (Day 6, page 6–2, lines 13–24). Britton did not arrive until 11:45 p.m.

tion, the following day, Tuesday, February 11, 1997, the Court suggested additional language to be included in the written instructions.

Counsel objected to reinstructing the jury on anything, whether in written or oral form, before the jury asked questions. Written instructions were not sent in at the time.

Later that day, around 12:30 p.m., the jury submitted five questions to the Court,[42] none of which implicated the instructions, and asked to recess at 1:00 p.m. The Court, via its staff, told the parties to submit proposed answers to the jury's questions.

The next morning, Wednesday, February 12, 1997, counsel for the defendant, rather than proposing a response to the jury's questions, put forth entirely new objections to the jury instructions, which had been given orally two days before (Monday) and which he had in written form the day before (Tuesday). In addition, he repeated still older objections which had already been finally resolved by the Court (those based on *Albright v. Oliver*). What he was *supposed* to be doing—proposing answers to the jury's questions—he did not do.

The Court initially took the position that counsel could only make objections related to typographical errors, that he could not raise objections he had not raised at sidebar. In fact, the Court relented.[43] By Wednesday morning's conference the Court heard and noted any and all objections, raised at the appropriate time or not, after thoughts or not. Day 7, pp. 9–20.[44] Conferring with counsel, the Court outlined the answers to the jury's questions, indicated that the jury would be orally reinstructed on malice and probable cause (an instruction defense counsel urged) and that these new instructions would be submitted along with the rest of the written instructions. (Day 7, page 6, lines 9–15). Counsel *did not* object to the submission of written instructions at this time.

To summarize, by the time of the verdict, this defense counsel had four opportunities to object, before instructions as usual, after instructions at sidebar, after Tuesday's draft of written instructions, and Wednesday's draft of written instructions. To suggest in these pleadings that the procedure did not meet the requirements of Rule 51 is absurd.

### b. Submission of Written Instructions

Counsel argues the written instructions that were given to the jury on Wednesday were too late—since they had already started to deliberate.[45] In addition, he challenges the fact that not every oral instruction was given to the jury in the written copies—e.g. instructions regarding the burden of proof, the special rules for party-admissions and depositions.

Neither of these objections was made at the time of submission of the written instructions on Wednesday and in any case, are not

---

**42.** The questions included the following:

(1) What does it mean to have a record sealed versus expunged?
(2) Is the transcript in this trial available to us?
(3) Is the Fourth Amendment the right to bear arms? If not what is it?
(4) Did the police have the right to keep a weapon after it is determined it is legal and no charges are brought?
(5) Are people normally arrested for an assault with a dangerous weapon?

*See* Trial Record, docket entry # 189, Questions submitted on February 11, 1997 at 12:30 p.m.

**43.** "I am essentially giving you an opportunity that few lawyers are given, which is an opportunity to object to instructions three days after the fact." Day 7, p. 15.

**44.** These objections mainly related to the state law claims. First, the defendant objected to the inclusion of "battery" with assault; the Court agreed to delete "battery." (Day 7, page 13, lines 21–25). Second, the defendant objected to the inclusion of "fear of bodily injury" in the Court's definition of assault; the Court agreed to remove it. (Day 7, page 15, lines 18–21). Third, the defendant objected to the "abusive and derogatory language" instruction with respect to the plaintiff's state civil rights claim; the Court agreed to remove that as well. (Day 7, page 18, lines 12–13). Finally, the Court agreed to add "without belief by the accuser in the guilt of the accused" to the definition of malice, (Day 7, page 19, lines 19–20), and to warn the jurors that "if you find there was probable cause to proceed against Mr. Britton, you may go no further." (Day 7, page 27, lines 11–12).

**45.** Counsel claims that the Court erred on February 12, "in submitted (sic) written instructions to the jury over defendants' objection when the jury had already been deliberating for two days." Motion of Defendant for a New Trial, p. 4.

48

a valid basis for asserting error under Fed. R.Civ.P. 51. Defendant never asked that *all* the instructions be given to the jury. The Court's practice, announced from the outset, was only to submit written instructions on the substantive law.

On Wednesday, February 12, 1997, defense counsel agreed to sending all written substantive instructions. While counsel had objected to reinstructing the jury on malice and the submission of written instructions on Tuesday,[46] by the next day he changed his mind; in fact he suddenly wanted additional instructions on malice and a host of other changes which he had not mentioned at side bar.

### c. Submission of an Amended Verdict Slip

At 3:55 p.m. on February 12, 1997, the third day of deliberations, the Court reconvened. A juror had an appointment in Cambridge and wanted to be dismissed for an hour and return to deliberate. The jurors had also submitted a question to the Court: "Is the definition of prosecution strictly limited to the act of bringing charges?" (Day 7, page 33, lines 20–21). In the middle of the conference on this question, defense counsel—as was his usual procedure by then—focused not on the question, but on the special interrogatories that had been submitted to the jury days before, a form which he had had for several days.

The special interrogatories asked the jurors: "Has the plaintiff, Randy Britton, proven by a preponderance of the evidence that defendant Patrick Maloney violated the plaintiff's federal civil rights by prosecuting him without probable cause and with an unconstitutional motive on July 3, 1990?" The questions relating to the plaintiff's other claims used the same form and language. Defense counsel pointed out that there was a dispute in the case about *when* the charges had been filed and objected to the inclusion

of the particular date, July 3, 1990, in the interrogatories.

When the Court asked defense counsel why this objection was being raised for the *first time* on the afternoon of the third day of deliberations, counsel represented that he had not yet had the opportunity to put this objection on the record. The Court had provided counsel with *three* other opportunities to put objections on the record, and he did not: February 10, 1997 (immediately after instructions);[47] February 11, 1997 (in the morning); and, February 12, 1997 (in the morning). Indeed, on the morning of February 12, 1997, defense counsel had said, "yesterday, I requested an opportunity from the clerk to be heard on the special verdict form. I had submitted a special verdict form." (Day 7, page 7, lines 18–19). The issue was not his preferred language; the issue was his objections to the Court's version. Defense counsel had not been shy about submitting additional written materials during the three days; nothing prevented him from highlighting this issue in writing.

Despite the lateness of the defendant's objections, the Court adopted them—again. The Court not only pointed out the factual dispute to the jury (concerning the day that charges were brought) and instructed them that the original verdict slip should in no way weigh in on their deliberations, but also distributed an amended verdict slip that met with everyone's approval, and took back the original form.[48]

### 2. Substantive Challenges to the Instructions

#### a. Malice

Defense counsel indicates that he had objected to the verbal "malicious prosecution" instruction in that it did not provide a definition of "malice." He then suggests that the court's deficient because the Court did not refer to malice in the section defining a sec-

---

**46.** Counsel objected because it "would constitute reinstructing the jury when they don't have a question." (Day 6, pages 6–4, lines 20–21).

**47.** The parties had copies of the special interrogatories at this point.

**48.** The Court warned the jury, "There is a dispute in this case as to when the charges were brought. Each side takes a different position as to when the charges were actually brought. This verdict slip in no way weighs on one side or the other of the dispute." (Day 7, page 37, lines 13–17).

tion 1983 claim. (Motion for a new trial, p. 7). Finally, he objects to the content of the instruction provided in writing and orally on February 12, 1997. Counsel's claims are without merit. However, because they dramatize the problems occasioned by counsel's negligence, they are worth describing in some detail.

Again, the short answer is that, as noted above, counsel did not provide the Court with *any* definition of malice, and when the court supplied her own, never objected to its *content or placement* in the instructions.[49]

The colloquy at the close of the instructions, is instructive:

> Defense Counsel: And I mean, that's related to the first thing I said. I suppose, I mean, not exact words but something to that effect, when you talk about malicious prosecution, you didn't define malice.
>
> The Court: No. Nobody gave me a malice instruction. Would you like me to?
>
> Defense Counsel: I think we have a written instruction on it as request No. 27 with respect to the abuse of process. We did say a mistake is not malice, it has to be deliberate. It's just—in looking through we did not request the Court to define malice to the jury but now that I've heard the instructions, I think the jury would like to know what the definition under the law is and certainly a mistake—

The Court: No, you are absolutely right. (Day 5, page 81, lines 1–15).

The Court then told the jury, precisely what counsel requested: that malice was more than mere mistake.[50] The defendant never asked for anything else or objected to what was given. *See* Fed.R.Civ.P. 51 ("No party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retired to consider its verdict, stating distinctly the matter objected to and the grounds of the objection.")

By the next morning, the Court, on reflection, suggested to the parties that the definition of malice could have been clearer. In the written instructions that the Court proposed sending to the jury, that had been faxed to the parties the night before, the Court included a new definition of malice. (Day 6, page 6–3, lines 20–22):

> "Malice is more than mere mistake. It is the intentional wrongdoing of a wrongful act without just cause or excuse, with an intent to inflict injury. When probable cause is deficient, you may infer the existence of malice, but you are not bound to do so." (Day 6, pages 6–3, line 24, page 6–4, lines 1–5).

As noted above, defense counsel objected to giving any instruction on malice when the jury did not have a question. (Day 6, page 6–4, lines 20–21). The Court accepted this objection (Day 6, page 6–5, lines 5–6).[51]

---

49. In request number 19, the defendants asked the Court to instruct the jury on the elements of malicious prosecution, with malice not defined at all, only the phrase "that the defendants acted maliciously." Two citations were included, though no specific word-for-word definition was submitted. Then, in request number 27, involving the elements of abuse of process, the defendants asked the Court to tell the jury only that "[m]alice cannot be inferred from mere mistake."

50. The Court's definition: "In addition, I described for you the outlines of malicious prosecution. I can only tell you that malice refers to— just a second—a state of mind of the defendant. I'm sorry—a state of mind of the defendants which goes essentially—cannot go beyond a mere mistake. Malice can be inferred from all the circumstances in this case. It really goes beyond simply a mere mistake. It goes to having ulteri-

or purposes of the kind that I described. That's what I meant by malice." (Day 5, February 10, 1997, page 84, lines 20–25, page 85, lines 1–3).

51. Defense counsel attempted to have his copy of the instructions faxed over by the Court "marked for identification," but the Court refused, cautioning counsel that "the only objections that I will allow on the record are the objections that you put on the record yesterday." (Day 6, page 6–6, lines 11–13). In response, defense counsel noted that one objection at the sidebar after oral instructions had related to malicious prosecution, and if the jury did come back with a question on that topic, he had some material he wanted the Court to consider. (Day 6, page 6–6, lines 15–18). Why those materials were not presented to the Court at the sidebar was not explained. In any event, it was clear that the court relented and permitted objections whether raised on a timely fashion or not. *See above.*

The next day, counsel changed his mind. After the jury came back with five questions (significantly, none having to do with "malice"), counsel withdrew his objections to written instructions. The Court then proceeded to read the new malice definition to the jury (Day 7, page 27, lines 23–25, page 28, line 1), as well as other language suggested by counsel (see below, on probable cause).[52]

### b. *The Legality of Britton's Rifle, and his Carrying a Rifle.*

The defendant asked the Court to instruct the jury that the plaintiff was not legally allowed to carry his rifle throughout Boston for "self-defense." The Court refused to give this instruction: First, Maloney conceded that it was legal for Britton to carry his rifle in his car and perhaps even into BPD Headquarters. He testified at trial that "[w]ithin the strict meaning of the law, [Britton] was legal ... The legality of it was not a question in my mind." (Day 2, page 82, lines 2–4).[53] Moreover, as Trial Exhibit 1 reflects, the police held the rifle for "safekeeping," not because it was illegally possessed. Indeed, when confronted with the fact that he had written "ill poss firearm" on the slip sent to Ballistics with Britton's rifle, Dooley claimed he made that entry since he "wasn't sure what the charges were going to be"—despite his knowledge of the accusations of assault. (Day 2, page 51, lines 5–6).

Since the legality or illegality of the rifle did not relate to the charges filed against

Britton, it was not relevant. *See Santiago v. Fenton,* 891 F.2d 373, 388 (1st Cir.1989) (even if defendant-officers had probable cause to arrest plaintiff for throwing a snowball, jury could have found for plaintiff on the malicious prosecution claim since defendants specifically rejected the snowball incident as the basis for the prosecution). Maloney not only disclaimed the rifle as the basis for charging Britton, he disclaimed its illegality.[54]

### 3. *Britton's Federal Civil Rights*

Counsel objected to the submission of any federal civil rights claim, based on *Albright,* addressed *supra* and to the language of the instructions as given.

### a. *General Description of 1983 Cause of Action*

In the instructions, the Court told the jury that a section 1983 claim involves three elements, that the defendant was acting under color of law, he deprived the plaintiff of rights, privileges or immunities secured by the Constitution or laws of the United States and, that defendants' acts were the proximate cause of the plaintiff's damage. The Court then outlined the rights implicated in the plaintiff's civil rights claim, suggesting that it would explain each of these rights later on in the instructions.[55] The rights involved are, "1) the right to be free from being charged with a crime without probable cause to belive a crime was committed, and

---

**52.** He also objects to the sentence "When probable cause is deficient, you may infer the existence of malice, but you are not bound to do so." The Court had initially declined to give the instruction on Monday when Britton proposed it; when the malice instruction was reconfigured the Court, after additional research, reconsidered. In any case, defendant's claim makes no sense; if there is no probable cause here it is only because the jury concluded that the witnesses never alleged an assault. Fabricating probable cause plainly supports an inference of malice.

**53.** Dooley's testimony on this issue was less clear. At trial, he said that he understood the FID card only allowed Britton to keep his rifle in his home and his place of business. (Day 2, page 34, lines 16–17). His statement, however, appeared to be based on a recent reading of the FID card statute—law which was not current at the time of the incidents. (Day 2, page 37, line 15). It also appeared to rely on a rule that

applied to the possession of pistols, and not to rifles. (Day 2, page 38, line 10). As a result, Dooley's opinion on this issue was confused. It was also less important, since Maloney was the ultimate decision maker with respect to the institution of the charges.

**54.** Likewise, the Court refused to take judicial notice of what defense counsel characterized as statutes that limit the ability of citizens to carry rifles in downtown Boston. Counsel cited 269 § 12D which he characterized as "prohibiting persons from carrying loaded rifles on public ways." It is clear that that statute was not the basis for the officer's actions. Moreover, Britton's rifle was not loaded.

**55.** It is important to outline the elements first, and then explain. Moreover, when instructions are written and formatted, the jurors are able to easily see that the general will be followed by the more specific.

2) the right to be free from unreasonable seizure of person and property, and 3) the ability to enforce that right." (Day 5, page 67, lines 17–22).

The defendant objects on the grounds that *Albright* eliminates any claims under either the first or third rights mentioned. As discussed at length above, I disagree. This case involved explicit Fourth Amendment issues, not diffuse substantive due process claims.

In addition, the defendant objects to the inclusion of the second right—the right to be free from unreasonable search and seizure—because all of the plaintiff's seizure claims—the seizure of the rifle—were disposed of before the trial of this civil rights claim. Whether the seizure of Britton's person or rifle later turned out to be valid, however, is irrelevant; the clear rule is that Britton had the right to challenge any such seizures.[56]

Defendant also objects to the instruction that there is a cause of action for taking steps that chill a Fourth Amendment right. I disagree, as described above.

### b. *Probable Cause*

The defendant claims the Court's instructions regarding the definition of probable cause placed an unduly high burden on the defendant-officers. Concerning probable cause, the Court gave the following instructions:

Probable cause is a legal term which means that the police officer who charged the individual must have sufficient facts which would warrant a reasonable man in believing that a criminal offense had been committed by the individual against whom the complaint was brought. A police officer is entitled to rely upon his own observations in determining whether or not probable cause for an arrest exists or information which is reasonably reliable which he may receive from others. Probable cause exists for any criminal offense only if there is probable cause to *demonstrate* that the individual accused has committed each and every element of the criminal offense.

Probable cause may not be based upon conjecture, speculation or surmise and it cannot be based on *pretextual,* or imagined, reasons.

It must be based upon observable objective evidence or other objective factors of the individual's actions.

(Day 5, page 70, lines 12–25, page 71, lines 1–3) (emphasis added). According to the defendant, the use of the word "demonstrate" is prejudicial error. Defendant argues the Court should have said "believe."

First, the word "demonstrate" does not mean "prove." It does not require that the jury find the defendants knew enough to establish the plaintiff committed a crime. It merely signified that the officers must have probable cause for all the elements of the crime. Moreover, in the first paragraph, the Court made clear that probable cause required that the officer "must have sufficient facts which would warrant a reasonable man in believing that a criminal offense had been committed by the individual charged." The sentence already used the phrase "probable cause"—reasonable belief—to demonstrate all the elements of the crime were present.

The defendant also complains about the Court's use of the term "pretextual," asserting that it invited the jury to peer into the minds of the defendants and discern their subjective motives. First and foremost, counsel never objected to the use of this word. In any event, this objection too falls short of the mark. As noted above, the Court pivoted its definition of "probable cause" on the "reasonable man," not on what defendants Dooley and Maloney believed. Second, the Court focused on the fact that probable cause must be based on "observable objective events," and contrasted that with "pretext" or "speculation" or "imagined reasons." An officer cannot fabricate facts to create probable cause; the Court's use of "pretextual" was designed to explain this rule to the jury.

---

56. The defendant, in a footnote, observes that it would have been entirely appropriate for me to have instructed the jury that the detention and investigation of the plaintiff on June 30, 1990, was "entirely reasonable under the circumstances." Defense counsel never requested such an instruction, so it was not given.

Moreover, the Court emphasized the centrality of probable cause to the plaintiff's case: "I have added a line that says, 'If you find there was probable cause to proceed against Mr. Britton, you may go no further. If there is probable cause, then you need not address the question of unlawful motivation.'" (Day 7, page 27, lines 10–13).[57] The jury's finding of liability proves they found the defendants did not have probable cause to bring charges against the plaintiff.[58] Probable cause is a question of fact; the jury's determination on this point is sound. Moreover, all of the "damaging" information concerning the plaintiff—possession of the rifle, threats with the rifle, the allegations that Britton solicited a prostitute while with his five year old daughter—were heard by the jury. The Court told the jury all this information was relevant to determine what the officers knew on June 30, 1990. Whether the jury either chose to disbelieve the officers' testimony or did not believe that the officers' knowledge and observations were sufficient is unimportant. The fact is that the jury found the defendants did not have probable cause to believe Britton had committed assault with a deadly weapon.

### c. Inquiry into the Subjective Minds of the Officers

The defendant also asserts that the objective determination of probable cause required under a Fourth Amendment/ § 1983 claim precludes any malicious prosecution claim. The Fourth Amendment, he contends, does not involve any consideration of the officers' motives. Again, the defendant is incorrect.

While the determination of a Fourth Amendment violation per se, as in a motion to suppress, may involve only objective factors, a section 1983 retaliation claim is different. Indeed, the First Circuit has explicitly recognized that "[a]ctual motive sometimes does play a role in section 1983 actions." *Holland v. City of Portland,* 102 F.3d 6, 10 (1st Cir.1996) (internal citation omitted). There may be probable cause to arrest, but arrest in fact was triggered only by a desire to chill First Amendment rights, or the enforcement of Fourth amendment rights.[59]

Where as in this case, the *only* § 1983 theory involves the fabrication of probable cause, both in the retaliation claim (concocting probable cause in order to prevent Britton from suing to recover his rifle) and the Fourth Amendment claim (prosecuting without probable cause), then a finding that probable cause was objectively present would be dispositive. In other words, if Stampley and Loughlin had in fact told the officers that Britton had pointed a rifle at them, there would have been grounds to prosecute, and thus, on these facts, no basis for claiming retaliation.

Accordingly, when defense counsel asked for an instruction suggesting the centrality of an objective determination of probable cause, the Court gave it. The Court instructed the jury that if they found that the officers had probable cause to proceed against the plaintiff, they could go *no further.* There could be no inquiry into subjective motivation, unless the plaintiff proved that there were no

---

57. This was a claim whose core was the concoction of probable cause. if the jury found that there was probable cause to prosecute then there was no basis for the claim.

58. It is clear from the jury's verdict that it found the officers did not have probable cause to believe that Britton had committed an assault. The Court explained that if there was such probable cause, the jury could not proceed any further. The fact that they did proceed to determine not only liability, but also damages, demonstrates their rejection of the defendants' asserted probable cause. This finding also supports Britton's claim under the Fourth Amendment. *Cf. Roche v. John Hancock Life Ins. Co.,* 81 F.3d 249, 256 n. 5 (1st Cir.1996) ("Even assuming the vitality of such an approach [a Fourth Amendment view of

*Albright],* the existence of probable cause vitiates any arguable Fourth Amendment claim.")

59. The Court recently heard the case of *Walsh v. Barkowski* (No. 94–CV–11438–NG) in which the police officer conceded that he had no intention of arresting the plaintiff, even though he had probable cause to do so. The plaintiff claimed that the arrest was triggered by her criticism of his behavior. Thus, although there may have been objective probable cause, the arrest and prosecution was allegedly motivated by something else—and something improper.

 This case is different. The claim is that probable cause was fabricated for a retaliatory purpose. If there was in fact objective probable cause, then—at least in this case—there was no basis for the retaliation claim.

objective facts underpinning the prosecution.[60] Probable cause was the first inquiry, and it was an entirely objective determination. Intent was a secondary inquiry if there were no probable cause.[61]

### d. *Causation*

The defendant argues that it was "plain error" for the Court to use the phrase "determining or motivating factor" in the instructions. The defendant argues that the correct language should have been "primarily," i.e. that the plaintiff must prove that the charges were primarily filed for an improper purpose. While the word "determining" conveys the same idea, "motivating" does not. "Motivating" he contends, is a lower threshold.

▮ The Court gave the following instruction to the jury on the issue of the relationship between the officer's state of mind, and the decision to prosecute without probable cause:

> If you find that the determining or motivating factor behind the prosecution of Mr. Britton is improper, you may find that the

prosecution was a violation of Plaintiff's civil rights. A determining or motivating factor is one which caused the prosecution to occur and without which you find the prosecution would not have occurred. An improper motivation includes, in the context of this case, a motive to chill, prevent or deter one or more of the Plaintiff's rights, here, the right to enforce the Fourth Amendment. The Plaintiff need not prove that the Defendants' sole motive was to retaliate for the plaintiff's exercise of his constitutional rights. Rather, the Plaintiff need only show that this unlawful motive was a determining or motivating factor in making the prosecution.

(Day 5, page 71, lines 11–25, page 72, lines 1–3).

Words like "determining" or "motivating" signify the same kind of importance as does "primarily." What needs to be conveyed to the jury is the idea that without the improper purpose, the charges would not have been filed. The words chosen by the Court sufficiently conveyed this nexus.[62]

---

**60.** This was clearly a two step process for the jury. The jurors were only permitted to confront the second question—i.e. the officer's improper intent—if the first question did not yield a negative answer: "If there is probable cause, then you need not address the question of unlawful motivation." (Day 7, page 27, lines 10–13). Following the Court's instructions, first, the jury was asked to look at all of the facts and circumstances known to the officers at the time and then determine whether they would "warrant a reasonable man in believing that a criminal offense had been committed by the individual charged." (Instructions at 4). Second, assuming the answer to the first inquiry was "No," then the jurors were to determine the motive of the officers.

**61.** Defendant also claims that the instructions were inconsistent. First the Court said that if there was no probable cause, the jury should go no further. Then in defining malice the court said that malice means "primarily motivated by hostility and ill will, and without belief by the accuser in the guilt of the accused."

Once again—the defendant requested *both* instructions, and never objected to the inconsistency now raised.

In any event, the two phrases are not inconsistent. If there is no probable cause, the jury must consider whether fashioning charges without probable cause was motivated by "malice." Although not likely on these facts, defendant could have argued that the pressing of charges was

simply an error, that Loughlin and Stampley told them one story that night, and another later on, etc., not motivated by malice or connected in any way to the threat of litigation.

**62.** In *Scott–Harris v. City of Fall River*, —— F.3d ——, 1997 WL 9102, *14 (1st Cir.1997), the district court instructed the jury that it could find for the plaintiff on proximate cause if the defendant's actions "[were] a substantial factor in bringing about the harm … It does not matter whether other concurrent causes contributed to the plaintiff's injuries so long as you find that the defendant's actions were a substantial factor in producing them. If defendant's actions were a substantial factor, then they were the legal cause or what we call the proximate cause." The First Circuit, while noting that no one had objected to these instructions, stated that it did "not mean to suggest that the particular instructions given here are problematic. To the contrary, they appear at first blush to comport with precedent." *Id* at —— n. 16.

It cited two other cases: *Furtado v. Bishop*, 604 F.2d 80, 89 (1st Cir.1979), *cert. denied*, 444 U.S. 1035, 100 S.Ct. 710, 62 L.Ed.2d 672 (1980) ("When a person's conduct is a 'substantial factor and a material element' in bringing about a foreseeable injury, he can be held liable for that injury … This satisfied plaintiffs' burden of proving that it was more likely than not that defendants foresaw and helped bring about the transfers to segregation.") (citations omitted);

Moreover, any concern arising from the lack of the word "primarily" is offset by other instructions. Indeed, the definition of malice provided by the Court used the very words counsel wanted, that it must be "primarily motivated by hostility and ill will, and without belief by the accuser in the guilt of the accused." (Day 7, page 27, lines 23–25, page 28, line 1.)

### e. *Definition of Improper Motive*

The defendant argues that the Court also failed to adequately define a term: improper motive. The Court instructed the jury that in this case, an improper motivation would include "a motive to chill, prevent or deter one or more of the Plaintiffs' rights, here, the right to enforce the Fourth Amendment." (Day 5, page 71, lines 21–23). Linking together several alleged instructional errors, the defendant hypothesizes that the lack of a proper definition for "improper," combined with the Court's "motivating factor" language, would have allowed the jury to find for the plaintiff even if the officers honestly believed that an assault had occurred, so long as part of the decision to charge relied on their desire to eliminate the plaintiff's threatened lawsuit. There is one crucial flaw in this logic: the jury could only find for the plaintiff if it found there was no probable cause. Whether the officers "honestly" believed an assault had occurred was not relevant because probable cause is an objective inquiry. If there was no probable cause—which the jury implicitly found when it found in Britton's favor—and the defendant instituted the charges to deter the threatened lawsuit, then the plaintiff met his burden.

### 4. *Other State law Claims:*

### a. *State Civil Rights Law*

Defendant objects to the definition of "threats, intimidation and coercion." The instruction was:

A threat simply means saying or gesturing, in effect, if you don't do this, then

something bad will happen to you. Coercion is making someone do something they are unwilling to do. Intimidation is scaring someone into doing something or refraining from doing something that otherwise they would do.

He claims that the state civil rights cause of action must involve an actual or physical confrontation, citing to *Layne v. MCI*, 406 Mass. 156, 158, 546 N.E.2d 166 (1989), and *Longval v. Commissioner of Correction*, 404 Mass. 325, 535 N.E.2d 588 (1989).

Again, counsel did not object, not at side bar, not ever.[63] In any event, more recent case law suggests otherwise. In *Langton v. Secretary of Public Safety*, 37 Mass.App.Ct. 15, 636 N.E.2d 299 (1994), the court denied summary judgment, in a case in which a prisoner maintained that prison authorities had threatened him with psychological testing, solitary confinement, and potential loss of parole after he sent a letter criticizing prison conditions.

### b. *Abuse of Process*

Counsel challenges instructions which suggest that even lawful process implemented for unlawful purposes may be unlawful. The instructions said:

For abuse of process, the plaintiff must prove that 1) process was used, 2) for an ulterior or illegitimate purpose, namely for a purpose other than that for which it was designed or intended; 3) which resulted in damage. An action for abuse of process can lie against police officers who use a lawful criminal process to accomplish an unlawful purpose.

Again, counsel did not object. Again, the instruction meets the requirements of state law. *See supra*, IIIB(2). *See also*, Restatement (Second) of Torts § 682, at 474 (1977).

■ Malicious prosecution and abuse of process are two different claims. To suffer malicious prosecution is to suffer damage

---

and *O'Brien v. Papa Gino's of Am., Inc.*, 780 F.2d 1067, 1072 (1st Cir.1986) (holding it was "a factual question for the jury to decide whether, according to proximate cause analysis, the polygraph results were a 'substantial factor' in the committee's decision to terminate [the plaintiff]").

**63.** He challenged a sentence about derogatory language or abusive language; it was excluded. Day 7, p. 16, p. 19. He did not make the claim he makes here.

based on a groundless or frivolous suit brought for an improper motive. To suffer an abuse of process is to suffer the consequences of legal actions which while having an adequate basis in law and fact are nonetheless manipulated by the defendant in order to secure a collateral advantage not within the scope of the law. *See* Harper, James & Gray, The Law of Torts, §§ 4.1, 4.9.

## D. *Remittitur*

 Defendant calls for remittitur pursuant to Rule 49 on the grounds that there was no evidence supporting an award of compensatory damages. As such, he argues, plaintiff is only entitled to nominal damages. The trial court has discretion to reduce the amount of the jury's award if such award is not "supported by the weight of the evidence." *Catullo v. Metzner*, 834 F.2d 1075, 1082 (1st Cir.1987). Here, the jury awarded Britton $200,000.[64]

In support, he cites *Davet v. Maccarone*, 973 F.2d 22, 29 (1st Cir.1992), claiming it holds that damages for mental distress are only available under § 1983 when there is actual proof of "objective recognizable damages."

*Davet* does not stand for this proposition; instead, it holds that when a jury's decision on damages is based on a "credibility determination," neither a trial court nor an appellate court may set aside the jury's decision. *Id.* at 30.

 In *Davet*, the plaintiff's evidence of damages consisted solely in his own testimony relating to the mental suffering and humiliation he experienced while under police custody; he presented no evidence of economic loss. The jury awarded no damages. The First Circuit refused to overrule the verdict and award damages, reasoning the jury had awarded no damages because it did not believe the plaintiff. *Id.* Here, Britton's evidence of damages also consisted solely of his own testimony relating to the mental anguish he suffered as a result of being charged with a crime.[65] He testified that he suffered severe emotional distress as a result of the charges. Like the jury in *Davet*, the jury in this case was free to listen to Britton's testimony and make whatever credibility determination it chose. But unlike the jury in *Davet*, this jury believed the plaintiff's testimony. Their decision to believe his testimony is not a decision I can question.

The defendant cites another case, *Perez v. Rodriguez Bou*, 575 F.2d 21 (1st Cir.1978), claiming Britton was not entitled to any damages because he did not offer any corroborating expert medical evidence concerning his mental distress. Again, *Perez* fails to support the defendant's argument.

In *Perez*, the trial court had awarded damages of only $1.00 per plaintiff, stating the award was "a symbol[ic]" victory for the plaintiffs, since he found "the actual damages suffered by plaintiffs are minimal." *Id.* at 24. The trial court found that the plaintiffs, university students, had only been suspended for twelve days as a result of the defendant's conduct. *Id.* Moreover, their records were to

---

**64.** A trial court may also condition its grant of the motion for a new trial on whether the victorious party agrees to a remittitur (decrease) of its damages. A court may then issue a remittitur reducing the plaintiff's compensation to the amount "a proper[ly] functioning jury should have found." *Zayas–Green v. Casaine*, 715 F.Supp. 15 (D.P.R.1989).

**65.** The instructions specifically told the jury the limits on the plaintiff's damage claims, instructing the jury that if they arrived at damages, they could consider the following:

 1. Any fear, anxiety, emotional or other mental distress or harm which the plaintiff suffered during or after the incident;
 2. Any emotional upset, distress, anxiety or other mental harm which the plaintiff suffered

as a result of the incident and the events which followed from it including his prosecution; and,
 3. Any humiliation, embarrassment, loss of self-respect or esteem or any emotional anxiety, mental harm, fear or mental anguish that the plaintiff has suffered up to the present time and may suffer, with reasonable certainty, in the future, as a result of the violation of his civil rights.
(Day 5, page 76, lines 19–25, page 77, lines 1–5.) The instructions went on to caution the jury what injuries could not be considered:
 Damages based on the abstract value or importance of constitutional rights are not a permissible basis of compensatory damages. *If you find that the plaintiff suffered no injury, no compensatory damages can be awarded.*
(Day 5, page 77, lines 14–18) (emphasis added).

be expunged, and they did not lose credit for the academic semester. *Id.*

On appeal, the First Circuit affirmed, observing that, in the past it had "suggested that 'in a civil rights action a plaintiff who proves only an intangible loss of civil rights or purely mental suffering may ... be awarded substantial compensatory damages.'" *Id.* at 24. (internal citations omitted). The court pointed out that the only evidence on damages involved the plaintiffs' statements of psychological harm, and on that record, it preferred to "respect the judgment of the district court as to appropriate damages in cases of this kind unless there is convincing evidence that the award was either too high to too low." *Id.*

■■■ All *Perez* establishes is that compensatory damages in § 1983 actions based solely on a plaintiff's mental distress are neither mandatory nor forbidden; whether or not to award them is entirely up to the factfinder. Indeed, one factor which potentially weighs in favor of damages is malice. In supporting the low damage award, the *Perez* court observed that it did not have before it "a case of officials acting out of malicious bad faith." *Id.* at 25.

■■■ Britton's case featured malicious bad faith; it also featured the bringing of formal criminal charges, which remained pending for two months. These differences make it clear that the harm he suffered was neither slight nor temporary. They more than justify the jury's award of compensatory damages and elevate the case several levels above *Perez.* Emotional distress can support an award of compensatory damages. *See Rowlett v. Anheuser–Busch,* 832 F.2d 194, 204–05 (1st Cir.1987) (holding that plaintiff's testimony concerning his emotional distress, in combination with that of the psychiatrist, and with the jury's common sense judgment of the emotional complications the plaintiff suffered, provides an adequate basis for the portion of the compensatory damage award attributable to emotional distress).

Britton testified that he had to miss classes at business school to attend court appearances; he recounted how he feared there would never be a resolution: "And I found it to be very distressful that false charges like that would be entered into the computer, become a part of the public domain, and anyone that sees that would think, at least at first blush, that I had done something wrong. And that was extremely distressing, and it affects me to this day." (Day 4, AM Session, page 83, line 25, page 85, lines 1–5). This testimony, while Spartan in length, certainly conveys the harms a reasonable juror would associate with being maliciously prosecuted. I see no reason to decrease the jury's award.

■■■ The defendant argues that Britton's failure to prevail on his intentional infliction of emotional distress claim precludes the recognition of any emotional damages. Not surprisingly, the defendant has cited no support for this argument because it is not the law. Damages based on credibility determinations are entirely within the province of the jury; they believed the plaintiff's testimony. At the same time, they simply could have chosen not to believe that Britton's distress "was severe and of a nature that no reasonable person could be expected to bear it," as required for intentional infliction of mental distress. (Day 5, page 75, lines 3–4).

### E. *Damages Under the § 1983 Claim*

The jury found liability on four counts out of five, but only awarded damages under the federal civil rights claim, the first question on the amended special interrogatories. The single award was clearly an effort by the jury to follow the Court's instructions on double recovery:

> The Plaintiff is not entitled to a double recovery. Therefore if you award the [sic] Mr. Britton damages for the constitutional claims you may not award any more damages under the common law claims.

Britton's only claims involved mental anguish and suffering occasioned by the defendant's conduct. The same harms were addressed by all his claims: Section 1983, state malicious prosecution, state civil rights violations, state abuse of process, and state intentional infliction of emotions distress. Clearly, the plaintiff did not suffer a different kind of mental distress under the state claims than under the federal civil rights claim. The jury

57

recognized the similar damages under all the
counts and so it only awarded damages un-
der the federal claim.[66]

**SO ORDERED.**

66. Defense counsel claims that the Court wrong-
ly excluded evidence of plaintiff's involvement
with prostitutes, citing to a colloquy on the first
day of trial. The claim is wholly disingenuous.
The evidence in question was *admitted* during the
trial to show the facts available to the officers in
making a determination of probable cause. *See*
Day 4, p. 57. Moreover, the line of questioning
was ruled available to the defendants on im-
peachment depending on Britton's direct testi-
mony (Day 2, p. 64); and depending on the
testimony of Britton's loss of consortium claim.
(Day 3, pp. 93–95.)